This is a medical malpractice/wrongful death case. The plaintiff, Marjorie Anne Travis, as executrix of the estate of Velma V. Lacy, sued in September 1992, alleging that the defendant doctors had failed to timely diagnose a bile duct leak in Velma Lacy's gallbladder bed and that, as a consequence, they had caused her death. The plaintiff appeals from a summary judgment in favor of the defendant doctors, Henry Eldon Scott *Page 675 
III, M.D., and Elmo Dodd Ozment, Jr., M.D.[1] We reverse and remand.
The trial court entered a summary judgment for Dr. Scott and Dr. Ozment on July 15, 1994, holding that the plaintiff had not produced substantial evidence that Velma Lacy would have survived if operated on some five days earlier and that the plaintiff had shown no causal relationship between the alleged acts of the defendants and the death of Velma Lacy. We must consider whether the trial court erred in so holding.
Rule 56, A.R.Civ.P., sets forth a two-tiered standard for determining whether to enter a summary judgment. In order to enter a summary judgment, the trial court must determine: 1) that there is no genuine issue of material fact, and 2) that the moving party is entitled to a judgment as a matter of law. In determining whether a summary judgment was properly entered, the reviewing court must view the evidence in a light most favorable to the nonmovant. See Turner v. Systems Fuel, Inc.,475 So.2d 539, 541 (Ala. 1985); Ryan v. Charles Townsend Ford,Inc., 409 So.2d 784 (Ala. 1981). In this case, Rule 56 must be read in conjunction with the "substantial evidence rule" set out in Ala. Code 1975, § 6-5-542(5), a part of the Alabama Medical Liability Act:
 "(5) SUBSTANTIAL EVIDENCE. Substantial evidence is that character of admissible evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed."
In medical malpractice cases, the plaintiff must prove that the alleged negligence "probably caused the injury."Parrish v. Russell, 569 So.2d 328, 330 (Ala. 1990). "The rule in Alabama in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. There must be evidence that the negligence probably caused the injury. Pappa v. Bonner, 268 Ala. 185,105 So.2d 87 (1958)." McAfee v. Baptist Medical Center,641 So.2d 265, 267 (Ala. 1994), quoting Baker v. Chastain, 389 So.2d 932,934 (Ala. 1980).
We thus look to the evidence presented by the plaintiff in support of her contention that the source of the bleeding that killed Velma Lacy was the "rather richly vascular undersurface of the liver in the area of the gallbladder bed," and the expert medical testimony offered in support of her allegations that Dr. Scott and Dr. Ozment breached the applicable standard of care and that the breach probably injured Velma Lacy.
The underlying facts are not disputed. On August 29, 1990, Velma V. Lacy was operated on at the Mobile Infirmary for the removal of her gallbladder. She remained in the hospital until September 21, 1990, when she was released. She was admitted to Providence Hospital on September 25, 1990, with a distended abdomen of unknown etiology. Her treating physicians were Dr. Scott and Dr. Ozment. Various tests were performed on her, including a paracentesis, which revealed bile-stained fluid. On October 3, 1990, Dr. Scott and Dr. Ozment performed surgery and found a slow bile leak in the gallbladder bed. The leak was sutured. Velma Lacy died on October 18, 1990. The cause of death was attributed to the effects of internal bleeding in the abdominal area. An autopsy was performed by Dr. Thomas Davis. In his autopsy report, Dr. Davis reported that the immediate cause of death was the exsanguinating intra-peritoneal hemorrhage. He reported: "The precise origin of this hemorrhage cannot be determined but it would seem most likely to have come from the rather richly vascular undersurface of the liver in the area of the gallbladder bed."
The evidence presented by the plaintiff included Dr. Davis's autopsy report and a subsequent deposition of Dr. Davis; the deposition of Dr. Boris Datnow; and the deposition of Dr. Stuart Battle. It is not disputed that Dr. Davis, having stated in his report the origin of the hemorrhage from which Velma Lacy died, later executed an affidavit *Page 676 
in which he attempted to recant this conclusion by stating:
 "I could not determine the source or origin of the hemorrhage, but I am of the opinion that the most probable source of the hemorrhage was a ruptured artery which I could not find during the autopsy."
In a later deposition, Dr. Davis stated that during the autopsy he was looking for a ruptured artery, because that was what he expected to find. Having found no ruptured artery, he said, he noted on his report the only other location from which the bleeding could have occurred, the "rather richly vascular undersurface of the liver in the area of the gallbladder bed." In his deposition, Dr. Davis acknowledged that his purported recanting of his first conclusion was based upon his frustration in not being able to confirm a ruptured artery and upon his reading of the deposition of the defendant doctors' designated pathology expert.
Dr. Boris Datnow testified by deposition for the plaintiff that he would have reached the same conclusion as that stated in the autopsy report. He observed that his own personal conclusion would have been that the source of the bleeding would have been "a fairly decent ooze" from the area of the surgery — the gallbladder bed.
Dr. Stuart Battle testified that Dr. Scott and Dr. Ozment breached the applicable standard of care when they failed to operate on Velma Lacy on September 27 and delayed operating until October 3 to stop the bile leak:
 "[Y]ou asked me about my opinions that I have formed, and basically it is my opinion that this case represents one of a delay in definitive treatment of a biliary leak. To be more specific Dr. Ozment on the 27th obtained bile from the fluid from Mrs. Lacy's abdominal cavity. She had about three weeks earlier had a gallbladder operation around the bile duct, and certainly the first thing that reasonable and prudent surgeons would think of drawing bile out of this suddenly accumulating abdominal fluid would be that there had been a bile leak from — subsequent to that procedure. It is my opinion that given such an instance that a rather rapid diagnostic sequence be undertaken to determine the source to see if it could be corrected nonoperative. That is, through a stent. For example, if a clip slipped off the cystic duct, you can sometimes control that without reoperating, but absent finding something that could be corrected without operation, re-operation should have been undertaken rapidly.
"Q. Like what?
 "A. By the 28th [of September], a day to do a hide-a-scan, a day for ERCP, a day to do — to try to find something corrective or non-operatively, and then this biliary leak and the accumulation of acid fluid addressed rapidly. I say that because bile is an irritating fluid to the peritoneal. If it's sterile it's mildly irritating. If it becomes infected it becomes quite virulent. In people over the age of 50 it is fairly well known that the bile in those people is more often than not contaminated with bacteria. Mrs. Lacy was 73. So the assumption could and should have been made that this was a potential time bomb in terms of it becoming infected with all of its dire consequences. Instead, I feel a delay that fell below [the] acceptable standard of care ensued, and she was allowed to go on to a septic biliary accumulation, which was manifest by cardiovascular and respiratory collapse on October first requiring intubation and intensive care and resulted in an intense inflammatory response in all of the organs that this covered. I say this was infectious because Dr. Learner cultured staph coagulate negative from the fluid on the first and then at the operation on the third the same bug was cultured from that fluid. Reasonable to assume it was not a contaminate, but a true pathogenic.
"Q. Was she afebrile?
 "A. She was afebrile most of the time until the time of her collapse. Her white count was in the normal range up until about the first. At which time it shifted dramatically to the left with 45 band forms indicative of a septic type picture. And I feel that the delay led to the intense — establishment of these intention [sic] inflammatory exudates, and they were described in the autopsy report as being *Page 677 
richly vascular exudates in the gallbladder bed. It's my opinion if it had been operated on in a timely fashion, by the 28th, that that intense inflammatory exudate would more than likely not have formed. It is my opinion that her death came as a result of presence of the drain in the subhepatic space, the development and ongoing smoldering inflammation in the subhepatic space with richly vascular exudates combined with anti coagulation, which was necessary. I feel that had it been done in a timely fashion I feel she more likely than not would not have bled on the 18th of October.
"Q. Why did they do the hide-a-scan?
 "A. To try to determine the source of the biliary leak.
"Q. That was reported as normal?
"A. Correct.
 "Q. Would that not give the surgeons some comfort in thinking that well maybe it's not a biliary leak?
 "A. Yes. It would give you comfort in that it was not a major aggressive bile at the time of the study, but it it's negative you know there's a leak somewhere, and the hide-a-scan did not show it.
 "Q. Do you think she had been leaking from the time of the study [sic] in the Mobile Infirmary, or do you think this was a sudden thing?
 "A. It's hard for anybody to say that. Certainly, the inflammation of the bile became manifest shortly after she was discharged. That is when she started to accumulate this transitive type fluid as a result of the inflammation.
 "Q. And the 400 to 500 CC's of fluid that Dr. Ozment had undertaken [sic] from her flank, you're not indicating that all of that was bile, are you?
"A. No.
"Q. Do you think it's 400 to 500 CC's of bile?
 "A. No. It was peritoneal fluid which contained bile.
 "Q. How about the tap that was done on the first of October? Do you think that all of that fluid was bile?
 "A. No. It was about the same fluid. It was slightly higher in bilirubin, but not much.
 "Q. Am I correct then in understanding that you feel it was a deviation from standard of care to wait from the 27th until the third to perform surgery on this lady?
"A. Yes.
"Q. Even with the normal hide-a-scan?
"A. Yes.
"Q. In you opinion what caused her death?
"A. Hemorrhage.
"Q. Hemorrhage from what?
 "A. From the richly vascular exudate from the gallbladder bed.
 "Q. The pathologist wasn't really certain on that, was he, in his report? Do you think he was?
 "A. He didn't say anything with certainty. He said most likely.
 "Q. And he also didn't make any indication of examining any arteries other than the major arteries?
"A. Correct.
 "Q. You've looked at many autopsy reports in your experience?
"A. Yes.
 "Q. Do you think that this particular pathologist did a complete autopsy on this patient to give you a complete picture of what might have caused her death?
 "A. Yes. As autopsies go it looked pretty thorough.
 "Q. Do you think that she experienced a major bleed shortly before her death?
"A. Yes.
 "Q. And you think that it came from — or did you tell me?
 "A. The richly vascular exudate in the gallbladder bed."
According to Dr. Battle, the medical records show that before September 27 the bile fluid was not infected. After that date, he said, the infectious component caused the bile to become far more irritating:
 "It is known that the longer a noxious, and in this case ultimately infected fluid is allowed to bathe the internal organs, the *Page 678 
surface of the liver, intestines, all of the peritoneal surfaces there, the more inflammatory responses that you get, the more likely it is to have these dense richly vascular exudative peels on the surface of the liver, the gallbladder bed. . . . That sets up a situation for her to have a major bleed in the presence of a drain and anticoagulation."
It was Dr. Battle's opinion that if surgery had been performed on September 27 Velma Lacy probably would have survived.
In entering the summary judgment for the defendant doctors, the trial judge held the plaintiff's expert testimony to be purely speculative and held that her expert witnesses had failed to create a genuine issue of material fact. We disagree.
The plaintiff's expert testimony supports her contention as to the source of the bleeding. Not only did Dr. Davis, in performing the autopsy, not find a ruptured artery, as he suspected he would, but he concluded that the only other plausible explanation was a slow leak or oozing from the gallbladder bed. Dr. Datnow reached the same conclusion. This expert medical testimony creates a genuine issue of material fact to be resolved by the jury. The plaintiff also created a genuine issue of material fact as to whether the alleged medical negligence probably harmed Velma Lacy. Dr. Stuart Battle testified that Dr. Scott and Dr. Ozment breached the applicable standard of care when they failed to operate on their patient on September 27. As noted in McAfee v. BaptistMedical Center, 641 So.2d 265, 267 (Ala. 1994), quoting Parkerv. Collins, 605 So.2d 824 (Ala. 1992): "It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that [the patient's] condition was adversely affected by the alleged negligence. [Citations omitted.]" 605 So.2d at 827.
Having carefully studied the record, we conclude that the plaintiff produced substantial evidence creating a genuine issue of material fact. Thus, the summary judgment was improper. That judgment is due to be reversed and the cause remanded for a trial on the merits.
REVERSED AND REMANDED.
MADDOX, ALMON, KENNEDY, and COOK, JJ., concur.
[1] The originally named defendants included Providence Hospital; Pulmonary Associates; Dr. Peter Chestnutt Coats; Dr. Marc Shane Gottlieb; Dr. Scott K. Saucier; and Dr. William Schulte. In the summer of 1993, the court entered final summary judgments for all those defendants. Only Dr. Scott and Dr. Ozment remained as defendants.