[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1216 
This appeal challenges a judgment entered on a jury verdict against DCH Healthcare Authority d/b/a DCH Regional Medical Center ("the Center") in favor of Mary K. Duckworth, as personal representative of her husband, Dee Duckworth, deceased, in Mrs. Duckworth's medical-malpractice action against the Center. We reverse and render a judgment for the Center.
According to the undisputed facts, 83-year-old Dee Duckworth went to the Center on October 9, 1999, to pick up Mary Duckworth, a patient at the Center, who was being discharged that day. After arriving at the Center, however, Mr. Duckworth fell on an escalator and struck his head. He was taken to the emergency department at 10:24 a.m. Mrs. Duckworth was notified of the accident and joined him at the emergency department.
At 10:59 a.m., Dr. Malcolm Nelson, the emergency-department physician, examined Mr. Duckworth and ordered an X-ray examination, which began at 12:36 p.m. For approximately 45 minutes preceding the X-ray examination, Mr. Duckworth waited in the hallway of the radiology department. While he was waiting, he developed a headache and nausea. He vomited during and after the X-ray examination.
At 1:17 p.m., Dr. Nelson ordered a computerized tomography scan ("CT scan"), which was performed at 1:54 p.m. At 2:00 p.m., the radiology department notified emergency-department personnel that Mr. Duckworth had a subdural hematoma. At approximately 2:15 p.m., Mr. Duckworth was relocated to the critical-care unit, and neurosurgeon Dr. Moses Jones was called to relieve the hemorrhage. Dr. Jones arrived at the Center at approximately 3:15 p.m. Surgery began at 4:40 p.m. and was completed at 6:00 p.m. Mr. Duckworth remained hospitalized until October 22, 1999, when he died as a result of the injuries he sustained in the fall on October 9.
Subsequently, Mrs. Duckworth sued the Center, alleging that Dr. Nelson and the other emergency-department personnel "caused or negligently allowed [Mr. Duckworth] to go without proper and timely evaluation, monitoring, care, and treatment for a potential closed-head injury, and failed to timely and properly address, observe and report changes in his condition." The complaint further alleged that as a consequence of the alleged negligence, Mr. Duckworth "was caused to worsen with a cerebral bleed and he was so injured that he died."
During the trial of the case, the Center moved for a judgment as a matter of law *Page 1217 
("JML") at the close of Mrs. Duckworth's evidence, and, again, at the close of all the evidence. As a ground for the motions, the Center asserted that Mrs. Duckworth failed to present substantial evidence of causation by expert testimony. The trial court denied the motions, and a jury awarded Mrs. Duckworth $350,000. The Center filed a postverdict motion for a JML. That motion was overruled by operation of law, pursuant to Ala. R. Civ. P. 59.1, and the Center appealed.
The standard of review of a motion for a JML is well established:
 "When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). . . . A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala. 1996)."
Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala. 1999).
Mrs. Duckworth's theory of the case is that the Center's diagnosis of her husband's condition and its treatment wasdilatory. More specifically, she complains of the failure of emergency-department personnel to respond timely and appropriately to her husband's visibly deteriorating condition "over a three (3) hour period." Mrs. Duckworth's brief, at 23. She contends that "this inferior care . . . adversely affected [his] condition," namely, the subdural hematoma, from which he subsequently died.
"To prove liability in a medical malpractice case, the plaintiff is required to show that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." Parker v. Collins, 605 So.2d 824, 826 (Ala. 1992). "There must be more than the mere possibility that the negligence complained of caused the injury; rather, there must be evidence that the negligence complained of probably caused the injury."Id.
As to causation in a dilatory-diagnosis-and-treatment case such as this one, "an action `may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care.'" Shanes v. Kiser,729 So.2d 319, 320-21 (Ala. 1999) (quoting Parker, 605 So.2d at 827) (emphasis added). "It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence."Parker, 605 So.2d at 827 (emphasis added). Unless "the cause and effect relationship between the breach of the standard of care and the subsequent complication or injury is so readily understood that a layperson can reliably determine the issue of causation," causation in a medical-malpractice case must be established through expert testimony. *Page 1218 Cain v. Howorth, 877 So.2d 566, 576 (Ala. 2003); see alsoBradley v. Miller, 878 So.2d 262 (Ala. 2003); Rivard v.University of Alabama Health Servs. Found., P.C., 835 So.2d 987
(Ala. 2002).
The Center contends that Mrs. Duckworth failed to present substantial evidence — by the requisite expert testimony — that the outcome of this case would have been different had the acts or omissions of which she complains not occurred. We agree.
Mrs. Duckworth's only expert medical testimony on the element of proximate cause was the videotaped deposition of Dr. Jones, who performed the surgery on Mr. Duckworth. His testimony as to proximate cause included the following:
 "Q. [Counsel for the Center:] Well, now, given . . . the fact that the record does show that you were involved with Mr. Duckworth as early as 3:15 [p.m.], and anesthesia was begun at 4:05 [p.m.], surgery was at 4:40 [p.m.], can you tell us, doctor, to a reasonable degree of medical certainty if the fact that Mr. Duckworth had vomited some time between 12:36 [p.m.] and 12:55 [p.m.] for the first time, and a CT scan was not obtained until around [2:00 p.m.], would that have made any difference in this ultimate outcome?
 "A. [Dr. Jones:] I don't think so. I don't think it has [any] impact whatsoever. Mr. Duckworth was taken to the operating room pretty much expeditiously after finding out what was going on with him.
 "Q. Well, now, prior to that, though, would it have made any difference if you had gotten there any earlier?
"A. No. No.
 "Q. In your opinion, in your medical opinion, doctor, to a reasonable degree of certainty, would Mr. Duckworth's outcome have been what it was?
 "A. Certainly. I see nothing about this course of events that tells me we could have corrected anything here by a time factor. You can always go back and say, well, is there some other management approach you could have taken, and it's a second guess. But, then, every time you try one of these other things, you can find other complications that could have or might have ar[isen]. So, sure, I don't see anything different to change."
(Emphasis added.)
Mrs. Duckworth refers to other portions of Dr. Jones's testimony in support of her argument that a more expeditious "diagnosis and treatment" would have placed her husband in a "better position than [he] was in as a result," Shanes, 729 So.2d at 321, of the two- or three-hour diagnostic period of which she complains. Specifically, she states:
 "Dr. Jones said it would be reasonable to expect that this patient's hematoma was smaller at the time he was being left in the hallway two (2) hours earlier than he saw him. Dr. Jones recognized that the timing of diagnosis and evacuation of this bleed has an effect on outcome. He also agreed with Dr. Nelson that a delay in diagnosis would `adversely affect' the patient's condition."
Mrs. Duckworth's brief, at 23 (citations to the record omitted). Dr. Jones's actual testimony in that connection is as follows:
 "Q. [Mrs. Duckworth's counsel:] The timing within which a surgeon can evacuate a hematoma like Mr. Duckworth had has some effect on *Page 1219 
the likelihood of a good outcome, doesn't it?
"A. [Dr. Jones:] Certainly.
"Q. You want to get to it as soon as possible?
"A. That's always the ideal, yes.
 "Q. Regardless of whether it's an elderly patient or an adolescent?
"A. That's correct.
 "Q. When you say that subdural hematomas like Mr. Duckworth suffered from are known to have an 80% mortality rate, timing of surgical intervention and relieving the pressure has an effect on improving the likelihood of a better outcome?
 "A. That's correct. Certainly, if you operate on it next week as opposed to today, that makes a big, big difference.
"Q. Well, and hours can make a difference, can't it.
 "A. All the studies show — well, I shouldn't say all the studies, but the standard of — by head-injury studies, put it that way, have shown that you basically have a major change in mortality based on an eight-hour window after discovery of the subdural. Now that's not necessarily after the injury.
". . . .
 "A. Because you don't have a precise time when the bleeding started. . . .
". . . .
 "Q. Doctor, with this patient, taking in consideration specifically with a history of this fall and injury to his head on the escalator and his resulting course, can you tell us, in your opinion, when his hematoma began to form in the subdural region?
 "A. I have no clue. I can't — I can only tell you where it was at the time when we did the CT [scan].
 "Q. Would you expect that the subdural hematoma that you encountered and which you described as being large would have been smaller or less involved with bleeding two hours earlier?
 "A. I would expect so, but I have no way of knowing that.
 "Q. I mean, scientifically, as a neurosurgeon, you would expect that probability?
 "A. I think that's a reasonable expectation, yeah. I think that you could possibly say that it was smaller two hours earlier than it was at the time I saw him.
". . . .
 "Q. But if I'm understanding your specialty and your practice correctly, physicians like yourself, who are trained to deal with these intracranial bleeds, want to evacuate the bleed at the earliest time to reduce the harm?
 "A. Right. And we have to have a window of opportunity to do that and that's why I said that the usual considered window of opportunity, and this is not an absolute. Obviously, you don't sit around and wait for eight hours to occur. But if you can get a subdural hematoma evacuated within that basically eight-hour window, the statistics show that those people survive better.
 "Q. [Dr. Nelson] had told us [in] his deposition when he was asked, generally, with a subdural bleed like Mr. Duckworth had, any delay in diagnosis can adversely affect a person's condition, and he said: *Page 1220 
`Yes, sir.' Would you agree with that in general?
"A. Yes. I think we've already said that."
(Emphasis added.)
Conspicuously absent from this testimony is any opinion as to how — or whether — the two- or three-hour diagnostic, or pre-operative, period of which Mrs. Duckworth complains probablyaffected the outcome of this case. On the contrary, Dr. Jones testified that there was an optimum period of eight hours
between diagnosis and surgery. The hematoma was discovered at 2:00 p.m. and removed by 6:00 p.m. Even computing the time from 10:24 a.m., when Duckworth arrived at the emergency room, until the hematoma was evacuated, only 7½ hours occurred before the surgery — within the optimum treatment period Dr. Jones described. Although Dr. Jones conceded that the hematoma "could possibly [have been] smaller two hours earlier," he did not explain how an increase in size would have adversely affected Mr. Duckworth's ultimate condition. He agreed with the general proposition that a "delay in diagnosis [could] adversely affect a person's condition," not that it did so in this
case.[1]
Indeed, Dr. Jones's testimony is functionally identical to the testimony held to be insufficient in McAfee v. Baptist MedicalCenter, 641 So.2d 265 (Ala. 1994). McAfee involved the consolidated appeals of two medical-malpractice plaintiffs. One plaintiff was Martin McAfee, a child who "developed bacterial meningitis and suffered permanent brain damage and vision impairment" as a result of the alleged malpractice. 641 So.2d at 266. The other plaintiff was Brenda Roberts, who developed breast cancer, which she alleged the defendants failed to discover.Id. McAfee alleged that Baptist Medical Center and others (collectively referred to as "Baptist Medical") "failed to recognize, appreciate, and treat [his] bacterial infection in a timely manner, . . . [resulting] in a worsening of [his] condition." Id. Similarly, Roberts alleged that Life Diagnostic Radiology and others "fail[ed] to properly evaluate [a] lump . . . found in [her] right breast . . . [resulting] in a one-year delay of treatment and . . . an unnecessary worsening of her condition." Id. In each case, the trial court granted the defendants' summary-judgment motions. This Court affirmed the summary judgments, explaining:
 "We have carefully studied the record in each of the cases before us and in both cases we conclude that the defendants made a prima facie showing that they were entitled to a judgment as a matter of law on the issue of causation by producing evidence that their actions did not cause the patient's condition to worsen. In neither case did the plaintiffs submit substantial evidence that the patient's condition worsened as a direct result of the actions of the defendant physicians.
 "In the first case, the baby, Martin McAfee, contracted meningitis from bacteria. He was treated by Dr. Rodney Dorand. Dr. Dorand, a board certified neonatologist, submitted an affidavit stating that he was familiar with the degree of care, skill, and diligence normally exercised by physicians practicing neonatology in 1990, and that, in his opinion, nothing he did or did not do in his care and treatment of Martin McAfee probably caused or contributed to cause any injury. The affidavit of the *Page 1221 
plaintiffs' expert, Dr. O. Carter Snead III, offered a conjectural observation that, generally, the sooner the onset of treatment, the better the expected result. There is no evidence that the actions of Dr. Dorand or those of Dr. Gillis Payne, who first saw the baby, probably caused the poor outcome. In the second case, the plaintiffs submitted affidavits stating, generally, that `time is of the essence' in treating breast cancer, and that patients who receive earlier treatment obtain a better result. There was no expert testimony to rebut the testimony submitted by the defendants indicating that the metastasis to the lymph nodes probably occurred in the early stages before the cancer could be diagnosed. The affidavits of the plaintiffs' experts did not rise to the level of substantial evidence that the actions of the defendants probably caused Brenda Roberts's injuries."
641 So.2d at 267-68 (emphasis added).
The general statements proffered by McAfee and Roberts — that "time [was] of the essence," and that "the sooner the onset of treatment, the better the expected result" — essentially mirror the statements made by Dr. Jones — as soon as possible is "always the ideal," and "any delay in diagnosis can adversely affect a person's condition." Like the testimony in McAfee, Dr. Jones's opinion does not constitute substantial evidence that the two- or three-hour delay of which Mrs. Duckworth complains probably adversely affected Mr. Duckworth's response to treatment.
The expert testimony presented in the cases cited by Mrs. Duckworth is clearly distinguishable. Travis v. Scott,667 So.2d 674, 678 (Ala. 1995) (plaintiff's expert testified that if surgery had been performed on the decedent two days after she was admitted to the hospital, rather than eight days after admission, she "probably would have survived"); University ofAlabama Health Servs. Found., P.C. v. Bush, 638 So.2d 794, 803
(Ala. 1994) (plaintiff's expert testified that the challenged delay in treating the plaintiff's meningitis infection "caus[ed]" or "contributed to the neurological damage that occurred");Parker v. Collins, 605 So.2d at 826 (breast-cancer patient's experts were "80% certain" that cancer invaded the lymph nodes, necessitating a "mastectomy and [a] course of chemotherapy and radiation treatments," because of the defendant-doctor's failure timely to diagnose a lump in the plaintiff's breast).
Because Mrs. Duckworth failed to present substantial evidence of medical causation, the trial court erred in denying the Center's motion for a JML. The judgment in favor of Mrs. Duckworth is, therefore, reversed, and a judgment is rendered in favor of the Center.
REVERSED AND JUDGMENT RENDERED.
HOUSTON, LYONS, BROWN, and JOHNSTONE, JJ., concur.
[1] Dr. Jones also stated that "[a] person over 70 years of age with an acute subdural hematoma probably has an 80 percent morality rate," and that the "risk" of death "in the elderly" in such cases was "very, very high."