[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 856 
The plaintiff, Christy Sorrell, appeals from a summary judgment entered in favor of Dr. Daniel A. King, Eastside Women's Specialists, P.C., Eastern Health System, Inc., and Medical Center East, Inc., the defendants in her action seeking damages for medical malpractice, breach of implied contract, products liability, and breach of warranty. We affirm.
 Facts and Procedural History
Dr. King is board-certified in obstetrics and gynecology. In July 2000, Sorrell consulted Dr. King because she was experiencing pelvic pain. After examining Sorrell, Dr. King recommended that Sorrell undergo a diagnostic surgical procedure to determine whether she had a cyst or a tumor in her abdominal or pelvic region. Dr. King testified that he made this recommendation based upon his examination of Sorrell, a review of Sorrell's medical records, her complaints of severe abdominal and pelvic pain, and the results of an ultrasound examination that had been performed earlier in July 2000. Dr. King testified that the ultrasound revealed that "there was suggestion of some type of process, be it a cyst or tumor or something else."
On July 7, 2000, Dr. King performed a "diagnostic/operative laparoscopy, lysis of adhesions, ablation of endometriosis[,] and cystoscopy" on Sorrell at a hospital operated by Medical Center East.[1] During the procedure, Sorrell was placed under general anesthesia. Before making an incision in Sorrell's abdomen, Dr. King inserted a uterine manipulator into Sorrell's cervix. Dr. King testified that the manipulator is "a device, whether permanent or reusable, that is attached either to the cervix or placed through the cervical opening to assist in moving the uterus and ovaries and tubes during a laparoscopy." Dr. King described the manipulator as device with "a large handle that looks sort of like a dome, which is connected to a shaft, at the end of which is a narrow piece that passes through the cervix up into the uterus, and has a retention balloon that can be insufflated to help keep it within the uterus." Dr. King also used an "adapter" in conjunction with the manipulator. The adapter is a component part of the manipulator that is used at the physician's option to modify the length of the manipulator. Dr. King testified that the adapter is "placed over the tip [of the manipulator] to modify the length of the tip." After the manipulator was inserted into Sorrell's cervix, Dr. King created an incision in Sorrell's abdomen so that he could view her abdomen and pelvis. Dr. King discovered "pelvic adhesions," which he cut away. Dr. King also discovered "endometriosis implants," which he "ablated" or destroyed. After the procedure *Page 857 
was completed, Dr. King closed the incision sites and removed the manipulator. However, Dr. King did not notice that the adapter had separated from the manipulator and that the adapter remained inside Sorrell's cervix when he removed the manipulator.
On July 20, 2000, Sorrell saw Dr. King for a scheduled postoperative visit. Dr. King testified that the scheduled visit was so that he could examine the surgical sites and inquire about any problems. Sorrell alleges that she complained to Dr. King of pelvic pain, cramping, and depression. Dr. King did not perform a pelvic examination on Sorrell during the visit. Dr. King testified that he examined the incision sites and found that they were "healing well" and that he did not "recall [Sorrell's] making any significant complaints." He also testified that his notes from the visit indicate that Sorrell's pelvic pain had improved.
On August 3, 2000, Sorrell saw Dr. King to receive the first of two injections of Depo-Lupron, a medication that Dr. King prescribed to treat Sorrell's endometriosis. Dr. King testified that he prescribed the Depo-Lupron injections because Depo-Lupron "stops the production of estrogen for a limited period of time, so that [the] endometrial lesions can regress." Sorrell alleges that, during this scheduled visit, she again complained of pelvic pain, cramping, and depression. Dr. King testified that during the visit Sorrell complained that she had experienced some bleeding and cramping. In his treatment notes from the August 3, 2000, visit, Dr. King wrote that Sorrell complained that "she has been bleeding dark blood with some clots over the past six days" and that "[s]he is cramping." Dr. King also testified that the "bleeding was highly likely to be related to the fact that she had such a history of taking . . . Depo-Provera,[2] which can invoke irregular bleeding . . . or that it could have been related to the placement and removal of the uterine manipulator up into the endometrial cavity." Dr. King testified that during the visit he informed Sorrell that the injection of the Depo-Lupron would "likely cause the bleeding to stop." Dr. King did not perform a pelvic examination on Sorrell during this visit; he testified that he did not feel that a pelvic examination was necessary.
Sorrell saw Dr. King on November 10, 2000, to receive her second injection of Depo-Lupron. Dr. King testified that during this scheduled visit Sorrell complained that she was unhappy with the side-effects of the Depo-Lupron, that she had been very emotional, and that she was experiencing pelvic pain. Dr. King did not perform a pelvic examination on Sorrell during the visit. Because of Sorrell's complaints of persistent pelvic pain, Dr. King referred Sorrell to Dr. C. Paul Perry, a gynecological pain specialist, but Sorrell indicated to Dr. King that she did not want to see another doctor.
On April 2, 2001, Sorrell visited Dr. Dan Hudson. During a pelvic examination, Dr. Hudson removed the adapter that had been left in her cervix during the July 7, 2000, procedure. Dr. Hudson never testified in this case, but the record indicates that Dr. Hudson performed a surgical procedure on Sorrell in April 2001, after he had removed the adapter, to remove a hemorrhagic cyst from her ovary. Dr. King testified that the adapter could not have caused the formation of the cyst, and Sorrell does not allege that the retained adapter caused the formation of the cyst. *Page 858 
Sorrell sued Dr. King, Eastern Health System, Medical Center East, Eastside Women's Specialists,[3] Dr. William A. Lemons,[4] and various fictitiously named defendants. The complaint alleged (1) that Dr. King and various fictitiously named defendants negligently performed the July 7, 2000, surgical procedure;[5] (2) that Dr. King and various fictitiously named defendants negligently examined Sorrell on July 20, 2000, August 3, 2000, and November 10, 2000;[6] (3) that Eastside Women's Specialists and Dr. Lemons were vicariously liable for the negligent acts of Dr. King; (4) that Eastern Health System and Medical Center East are vicariously liable for the acts of various fictitiously named defendants — those agents or employees of Eastern Health System and Medical Center East who treated Sorrell on July 7, 2000;[7]
(5) that Eastern Health System and Medical Center East had breached an implied contract to provide Sorrell with adequate medical services; and (6) that various fictitiously named defendants had negligently or wantonly designed, manufactured, assembled, sold and/or distributed the uterine-manipulator device, had failed to adequately warn Sorrell of the dangers associated with the use of the uterine-manipulator device, had breached an implied warranty, and had breached an express warranty.[8]
On February 28, 2003, Dr. King filed a motion to compel, requesting that Sorrell be ordered to identify all the experts she planned to use in the case; to provide Rule 26(b)(4), Ala. R. Civ. P., information on those experts;[9] and to provide a list of dates when the experts could be deposed. The trial court granted the motion on March 7, 2003, and ordered Sorrell to provide the requested information by March 15, 2003. After the trial court granted Dr. King's motion to compel, Sorrell identified Dr. Harland Giles as her expert. Sorrell also informed Dr. King that Dr. Giles would charge $750 per hour for the time he spent in deposition.[10] On April 7, 2003, Dr. King filed a motion to compel Sorrell to provide additional information on Dr. Giles and any other experts she planned to use at trial and a motion to establish the hourly rate for Dr. Giles's deposition testimony. The motion stated that Sorrell "identified an expert, but provided no Rule 26(b) information." Dr. King also stated in the motion that Dr. Giles's fee of $750 per hour was unreasonable, and he requested that the trial court establish a reasonable hourly rate for Dr. Giles's deposition *Page 859 
On April 22, 2003, Sorrell provided Dr. King with additional information about Dr. Giles. Sorrell also notified Dr. King that "other doctors that have treated Ms. Sorrell Since Dr. King's treatment will testify regarding their observations during examination and treatment of [Sorrell]." Sorrell identified the "other doctors" as Dr. Hudson and Dr. Francois Blaudeau. Sorrell also stated that she also "may call Dr. Kenneth Hall . . ., Dr. Gregory James and Dr. Bryant Poole." On April 24, 2003, in response to Dr. King's April 7, 2003, motion to compel, the trial court ordered Sorrell to provide within seven days the names and addresses of all expert witnesses she intended to use at trial and to provide a summary of the testimony expected to be given by the witnesses. The trial court also found that the hourly fee Sorrell claimed was required for the deposition of her expert, Dr. Giles, was unreasonable. The trial court ordered that Dr. King would be required to pay $350 per hour to depose Dr. Giles and that Sorrell would be responsible for payment of any fees charged by Dr. Giles in excess of that amount.[11]
On May 2, 2003, Sorrell identified "Dr. Shrout" as an expert witness that she would call to testify in the case.[12]
Sorrell stated that Dr. Shrout would testify as to Dr. King's breach of the standard of care and as to causation. On May 6, 2003, Sorrell filed a motion requesting additional time to name an expert who would testify as to the claims against Medical Center East and Eastern Health System.
On May 16, 2003, the trial court granted a summary-judgment motion filed on April 30, 2003, by Dr. Lemons and Eastside Women's Specialists. Sorrell never responded to their motion. The order of the trial court stated that a summary judgment was proper given that Sorrell failed to oppose the summary-judgment motion or otherwise to respond to the motion. On June 18, 2003, Sorrell filed a motion to vacate the summary judgment in favor of Eastside Women's Specialists.[13] Sorrell argued that the judgment should be vacated because her counsel did not receive a copy of Eastside Women's Specialists' summary-judgment motion until he received the trial court's May 16, 2003, order granting it.
On August 13, 2003, the trial court stayed the proceedings because the insurance carrier for Dr. King, Eastern Health System, and Medical Center East had entered into liquidation proceedings.[14] Therefore, the trial court ordered that the case be placed on the administrative docket until January 13, 2004.
On March 3, 2004, at a pretrial conference, the trial court granted Sorrell's June 18, 2003, motion to vacate the summary judgment in favor of Eastside Women's Specialists. The trial court also scheduled the trial for September 2, 2004. *Page 860 
On July 23, 2004, Dr. King filed a motion to compel Sorrell to provide for deposition the experts she planned to use at trial. The motion also stated that Sorrell's attorney had not responded to Dr. King's requests to set deposition dates for the experts she had identified. On August 4, 2004, the trial court granted Dr. King's motion and ordered Sorrell to make her experts available for deposition before August 31, 2004, or be barred from using the expert at trial. On August 27, 2004, Sorrell filed a motion requesting additional time to make one of her experts, Dr. Shrout, available for deposition. The motion stated that Dr. Shrout had moved since Sorrell had last contacted her and that Sorrell's attorney had only recently been able to get in touch with Dr. Shrout. The trial court did not rule on this motion. Sorrell failed to make Dr. Shrout or any other expert witness available for deposition before August 31, 2004. Therefore, pursuant to the trial court's August 4, 2004, order, Sorrell was precluded from using an expert witness a trial.
On September 7, 2004, Eastern Health System and Medical Center East filed a "motion for judgment as a matter of law."[15]
Eastern Health System and Medical Center East argued the following in support of their motion:
 "1. On March 7, 2003, this Court ordered the plaintiff to identify experts and provide Rule 26[, Ala. R. Civ. P.,] information by March 15, 2003.
 "2. On August 4, 2004, the Court ordered the plaintiff to make experts available for deposition by August 31, 2004 or be precluded from using experts at trial.
 "3. The plaintiff has not identified any expert witnesses.
 "4. The plaintiff cannot prove [her] claims without expert testimony as required by [Ala. Code 1975] § 6-5-548."
On September 15, 2004, Dr. King and Eastside Women's Specialists filed a "motion to join in co-defendants' motion for summary judgment as a matter of law." However, Dr. King and Eastside Women's Specialists "modified" the motion to state that Sorrell had identified Dr. Shrout as her expert but had failed to present her expert for deposition within the deadline set by the trial court. On September 22, 2004, Sorrell filed a response in opposition to the summary-judgment motion with supporting exhibits, and the trial court held a hearing on the motion.[16]
On September 23, 2004, the trial court entered an order stating:
 "This cause was heard on September 22, 2004 on the Defendant[s'] Motion for Judgment As A Matter Of Law And Summary Judgment. The Court has considered the motions and the pleadings before the Court at this time as well as the arguments of counsel for all parties. The Court finds that based upon the pleadings and evidence before the Court there exists no genuine issue of material fact and the Defendants are entitled to a Judgment as a matter of law. Accordingly, the Defendants'] motions] for Judgment As A Matter of Law and Summary Judgment are GRANTED and JUDGMENT is entered in favor of the Defendants Dr. Daniel A. King, Eastside Women's Specialists, [P.C.,] Eastern Health System, Inc. and Medical Center East, Inc. and against the Plaintiff Christy Sorrell as to all claims asserted in this action."
Other than stating that there was no genuine issue of material fact, the trial court *Page 861 
did not provide specific reasons for entering the summary judgment in favor of the defendants. On October 22, 2004, Sorrell filed a motion to vacate the summary-judgment order. On November 18, 2004, the trial court denied Sorrell's motion to vacate. Sorrell appealed.
 Standard of Review "`"In reviewing the disposition of a motion for summary judgment, we utilize the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact" and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989).'
 "Ex parte General Motors Corp., 769 So.2d 903, 906 (Ala. 1999).
 "`When the basis of a summary-judgment motion is a failure of the nonmovant's evidence, the movant's burden, however, is limited to informing the court of the basis of its motion — that is, the moving party must indicate where the nonmoving party's case suffers an evidentiary failure. See General Motors, 769 So.2d at 909 (adopting Justice Houston's special concurrence in Berner v. Caldwell, 543 So.2d 686, 691 (Ala. 1989), in which he discussed the burden shift attendant to summary-judgment motions); and Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating that "a party seeking summary judgment always bears the initial responsibility of informing the [trial] court of the basis of its motion").'
 "Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala. 2001).
 "`When the trial court does not give specific reasons for entering a summary judgment, we will affirm the judgment if there is any ground upon which the judgment could have been based. Yarbrough v. C S Family Credit, Inc., 595 So.2d 880, 881
(Ala. 1992).'
 "McCloud v. City of Irondale, 622 So.2d 1272, 1273 (Ala. 1993)."
Brown v. St. Vincent's Hosp., 899 So.2d 227, 233-34
(Ala. 2004).
 Discussion I.
In a medical-malpractice action,
 "the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case."
Ala. Code 1975, § 6-5-548(a). To meet this burden, "the plaintiff ordinarily is required to present expert testimony as to the relevant standard of care." Martin v. Dyas,896 So.2d 436, 441 (Ala. 2004). This Court has recognized an exception to this rule
 "`"in a case where want of skill or lack of care is so apparent . . . as to be *Page 862 
understood by a layman, and requires only common knowledge and experience to understand it."' [Tuscaloosa Orthopedic Appliance Co. v.] Wyatt, 460 So.2d [156,] 161 [(Ala. 1984)] (quoting Dimoff v. Maitre, 432 So.2d 1225, 1226-27 (Ala. 1983)). This Court has recognized the following situations as falling within this exception:
 "`"1) where a foreign instrumentality is found in the plaintiffs body following surgery;. . . ."'
 "Alfred [v. Shirley], 598 So.2d [1347,] 1350 [(Ala. 1992)] (quoting Holt v. Godsil, 447 So.2d 191, 192-93 (Ala. 1984) (citations omitted in Allred))."
Anderson v. Alabama Reference Labs., 778 So.2d 806, 811
(Ala. 2000) (emphasis added). In Houserman v. Garrett,902 So.2d 670, 673 (Ala. 2004), a doctor left a surgical-gauze pad inside a patient. This Court held that it is the surgeon's responsibility "`to remove before closing the incision all foreign objects due to be removed'" and that "`[t]he presence of [a] retained object is prima facie evidence of negligence by the surgeon in carrying out that responsibility.'"902 So.2d at 673 (quoting Breaux v. Thurston, 888 So.2d 1208, 1217
(Ala. 2003)).
A plaintiff in a medical-malpractice action must also present expert testimony establishing a causal connection between the defendant's act or omission constituting the alleged breach and the injury suffered by the plaintiff. Pruitt v.Zeiger, 590 So.2d 236, 238 (Ala. 1991). See also Bradleyv. Miller, 878 So.2d 262, 266 (Ala. 2003); University ofAlabama Health Servs. Found., P.C. v. Bush, 638 So.2d 794,802 (Ala. 1994); and Bradford v. McGee, 534 So.2d 1076,1079 (Ala. 1988). To prove causation in a medical-malpractice case, the plaintiff must demonstrate "`that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury.'" Bradley, 878 So.2d at 266
(quoting University of Alabama Health Servs.,638 So.2d at 802). See also DCH Healthcare Auth. v. Duckworth,883 So.2d 1214, 1217 (Ala. 2003) ("'There must be more than the mere possibility that the negligence complained of caused the injury; rather, there must be evidence that the negligence complained ofprobably caused the injury.'" (quoting Parker v.Collins, 605 So.2d 824, 826 (Ala. 1992))); and Pendarvisv. Pennington, 521 So.2d 969, 970 (Ala. 1988) ("`The rule in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury; there must be evidence that the negligence probably caused the injury.'" (quoting Williams v. Bhoopathi,474 So.2d 690, 691 (Ala. 1985), and citing Baker v. Chastain,389 So.2d 932 (Ala. 1980))). In Cain v. Howorth,877 So.2d 566 (Ala. 2003), this Court stated:
 "`"To present a jury question, the plaintiff [in a medical-malpractice action] must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably
caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have `selective application' to one theory of causation."'"
877 So.2d at 576 (quoting Rivard v. University of AlabamaHealth Servs. Found., P.C., 835 So.2d 987, 988 (Ala. 2002)). However, the plaintiff in a medical-malpractice case is not required to present expert testimony to establish the element of proximate causation in cases where "the issue of proximate cause is not . . . `beyond the ken of the average layman.'" Goldenv. Stein, 670 So.2d 904, 908 (Ala. 1995). Therefore, "[u]nless `the cause and effect relationship between the breach of the standard of care *Page 863 
and the subsequent complication or injury is so readily understood that a layperson can reliably determine the issue of causation,' causation in a medical-malpractice case must be established through expert testimony." DCH HealthcareAuth, 883 So.2d at 1217-18 (quoting Cain,877 So.2d at 576).
 A.
Sorrell alleged in her complaint that Dr. King breached the standard of care during the July 7, 2000, surgery when he left a foreign object — the adapter — in Sorrell's cervix. In support of his motion for a summary judgment, Dr. King argued that because Sorrell could not prove that he breached the applicable standard of care through expert testimony as required under Ala. Code 1975, § 6-5-548(a), he was entitled to a judgment as a matter of law. Sorrell argues, however, that because Dr. King concedes that he failed to remove the adapter immediately following the surgical procedure, expert testimony was not required to prove the relevant standard of care. However, we see no need to address the issue of expert testimony as it relates to the standard of care because Sorrell cannot present sufficient evidence establishing proximate causation, given that she has been barred from using an expert at trial.
Sorrell argues that, although a plaintiff in a medical-malpractice case is generally required to present expert testimony to prove the element of proximate causation, under the facts of this case proximate causation need not be established by expert testimony. Specifically, Sorrell argues that the facts of this case are similar to the facts of Golden v.Stein, supra, and that expert testimony is not required under the facts here because, she contends, the proximate cause of her injuries are not beyond the comprehension of the average layman.
In Golden, a woman sued her doctor alleging that he had performed an unnecessary procedure. Golden,670 So.2d at 906. In response to the doctor's motion for a summary judgment, the plaintiff presented expert testimony indicating that the surgery was unnecessary and that in performing the surgery the doctor had breached the standard of care.Golden, 670 So.2d at 907. Because the expert did not testify as to causation, the trial court found that the plaintiff had failed to present sufficient evidence establishing that the alleged unnecessary surgery proximately caused her injuries. Therefore, the trial court granted the doctor's summary-judgment motion. Golden, 670 So.2d at 906. This Court held that the plaintiff "presented sufficient evidence to establish that there was a genuine issue as to proximate cause." Golden, 670 So.2d at 907. The Court stated:
 "In most medical malpractice cases, proximate cause must be established by expert testimony. See, e.g., Bradford v. McGee, 534 So.2d 1076, 1080
(Ala. 1988). The reason for this rule is that issues of proximate cause in medical malpractice cases are ordinarily `beyond "the ken of the average layman."' C. Gamble, McElroy's Alabama Evidence,§ 127.01(5)(c), p. 333 (4th ed.1991).
 "But in cases like this one, involving allegations that a defendant performed unnecessary medical procedures, the issue of proximate cause is not always `beyond the ken of the average layman.' Clearly, the average layman, without the assistance of an expert, can recognize a causal connection between the performance of an unnecessary operation and most items of harm or injury claimed by the plaintiffs in this case. The cost of the unnecessary procedure, any provable pain and suffering or lost consortium *Page 864 
associated with the unnecessary procedure, and any wages that can be proven to have been lost during the normal recovery period for such an operation would constitute harm or damage the proximate cause of which would be `within the comprehension of average laymen.' See Williams v. Spring Hill Memorial Hospital, 646 So.2d 1373, 1375 (Ala. 1994). However, any claims for damages based on complications from the unnecessary procedure would be subject to the general rule that expert testimony is normally required to establish proximate cause in the medical malpractice context."
Golden, 670 So.2d at 907-08 (footnote omitted).
Sorrell argues that, like the plaintiff in Golden, she is not required to present expert testimony establishing proximate cause. Sorrell contends that the cause-and-effect relationship between the alleged breach of the standard of care — Dr. King's leaving the adapter in Sorrell's cervix — and the subsequent complications or injuries — pain, bleeding, depression, etc. — would be readily understood by a layman. We disagree.
The facts of this case are distinguishable from the facts ofGolden. The Court in Golden limited its holding to cases "involving allegations that a defendant performed unnecessary medical procedures." Golden,670 So.2d at 908. In addition, the Court held that the proximate cause of the cost of the procedure, pain and suffering, or lost consortium associated with the unnecessary procedure, and wages lost during recovery would be within the comprehension of the average layman, but that the proximate cause of any complications related to the unnecessary procedure would be subject to the general rule requiring expert testimony.Golden, 670 So.2d at 908.
Sorrell's claims are based upon her assertions that her injuries were the result of medical complications related to Dr. King's leaving the adapter in Sorrell's cervix. Therefore,Golden actually supports the proposition that Sorrell was required to present expert testimony to prove proximate causation. Whether Sorrell's injuries were caused by Dr. King's leaving the adapter in her cervix would not be within the comprehension of the average layman. Thus, this case is not within the class of medical-malpractice cases in which proximate cause does not have to be established by expert medical testimony.
Sorrell also argues that she should not be required to present expert medical testimony as to the proximate cause of her injuries because, she contends, Dr. King's own deposition testimony provides substantial evidence of proximate cause. In his deposition, Dr. King testified as follows:
 "Q. [Sorrell's counsel:] What symptoms would you say would be symptomatic of a foreign body left in the vagina or in the cervix?
 "A. Discharge, bleeding, pain, fever.
 "Q. And when would you expect these problems to occur —
 "A. Well —
 "Q. — time-wise, after a foreign object was left in there?
 "A. It can be quite variable. If could be on the order of days to many months, if not years.
 ". . . .
 "Q. Well, let's specifically talk about [the adapter], then. What type of problems would you expect a person to have, having that piece of medical device in them for any period of time?
 "A. They might develop —
 "Q. Let me — go ahead, I'm sorry. *Page 865 
 "A. They might develop those same symptoms I indicated, you know, in response to your question regarding any foreign object left in the vagina.
 "Q. Discharge, bleeding, pain, fever?
 "A. (Witness nods head up and down.)"
Although Dr. King's testimony establishes that Sorrell's pain and bleeding were possibly caused by the presence of the adapter in her cervix, Dr. King's testimony does not establish that the presence of the adapter probably
caused her injuries. See Bradley, 878 So.2d at 266;DCH Healthcare Auth., 883 So.2d at 1217; andPendarvis, 521 So.2d at 970. Dr. King testified that the adapter might cause discharge, bleeding, pain, and fever, but he did not testify that injuries Sorrell alleged she suffered were probably caused or even likely caused by the presence of the adapter in her cervix. Dr. King's testimony demonstrates only a mere possibility that the adapter caused Sorrell's alleged injuries. We reject Sorrell's contention that Dr. King's testimony amounts to substantial evidence indicating that the presence of the adapter was the proximate cause of her injuries.
The record also contains evidence suggesting that Sorrell's complaints of pain, bleeding, and depression did not relate to the adapter. Dr. King testified that the bleeding could have been associated with her menstrual cycle because of her history of taking Depo-Provera and that the Depo-Provera could "invoke irregular bleeding, break-through bleeding from time to time. . . . " Dr. King also testified that bleeding is a frequent complaint of patients who undergo laparoscopic procedures. In addition, Dr. King testified that her continued complaints of pelvic pain could have been related to the endometriosis. Although Sorrell alleged that she suffered from depression after the procedure, there is no evidence in the record showing that the presence of the adapter could have caused her depression. Sorrell's medical records demonstrate that she had a history of depression and that she had taken multiple antidepressant medications before the surgical procedure. Dr. King's treatment notes from the scheduled November 10, 2000, postoperative visit state:
 "[S]he has been tapering herself down off Serzone [an antidepressant]. She has been on multiple different antidepressant medications in the past. She declines my offer to switch her to another medication."
Dr. King offered to provide Sorrell with hormone-replacement therapy in an attempt to alleviate her depression, but Sorrell also refused that treatment.
Because Sorrell has been precluded from presenting expert testimony in this ease, she will be unable to present sufficient evidence to create a genuine issue of material fact on the issue whether the adapter was the proximate cause of her injuries. Therefore, the trial court did not err in entering a summary judgment for Dr. King as to Sorrell's claim that he breached the standard of care when the adapter was left in her cervix during the July 7, 2000, surgical procedure.
 B.
In her complaint, Sorrell also alleges that Dr. King breached the standard of care by failing to properly examine her during her three postoperative visits. Sorrell alleges that, given her symptoms and complaints, Dr. King should have performed a pelvic examination during those postoperative visits. Sorrell also contends that she is not required to present expert testimony establishing that Dr. King's failure to perform a pelvic examination was a breach of the standard of care. InAnderson, supra, this Court held that a *Page 866 
plaintiff in a medical-malpractice action is not required to present expert testimony establishing the standard of care
 "`"1) where a foreign instrumentality is found in the plaintiff's body following surgery; 2) where the injury complained of is in no way connected to the condition for which the plaintiff sought treatment; 3) where the plaintiff employs a recognized standard or authoritative medical text or treatise to prove what is or is not proper practice; and 4) where the plaintiff is himself or herself a medical expert qualified to evaluate the doctor's allegedly negligent conduct."'"
778 So.2d at 811. The allegation that Dr. King breached the standard of care in failing to perform a pelvic examination during one of Sorrell's postoperative visits does not fall within any of the exceptions set out by this Court inAnderson. Sorrell did not present any expert testimony indicating that the applicable standard of care required Dr. King to perform a pelvic examination during her scheduled postoperative visits. Dr. King testified that he did not think that the standard of care required him to perform a pelvic examination during those scheduled postoperative visits and that it was his "clinical impression" that such pelvic examinations were not necessary. Therefore, because Sorrell did not present any expert testimony establishing that Dr. King's failure to perform a pelvic examination was a breach of the standard of care, she failed to present sufficient evidence to overcome Dr. King's motion for a summary judgment as to this claim.
 II.
Sorrell alleged in her complaint that under the doctrine of respondeat superior Eastside Women's Specialists is vicariously liable for the negligent acts of Dr. King. Because we hold that the trial court did not err in entering summary judgment in favor of Dr. King, summary judgment was also proper as to Eastside Women's Specialists. University of Alabama HealthServs. Found., P.C., 638 So.2d at 799 ("Under the doctrine of respondeat superior, the master cannot be liable unless one of the master's servants has been found to be negligent.").
 III.
Sorrell argues on appeal that even if the trial court did not err in entering a summary judgment for Dr. King, the trial court erred in entering a summary judgment in favor of Eastern Health System, Medical Center East, and Eastside Women's Specialists because, she argues, "a Hospital may be held liable for breach of warranty without expert witnesses." However, Sorrell's breach-of-warranty claims were alleged against fictitiously named defendants that she never identified.[17]
Sorrell never alleged that Medical *Page 867 
Center East, Eastern Health System, or Eastside Women's Specialists breached a warranty. Sorrell essentially attempts to assert a breach-of-warranty claim against Medical Center East, Eastern Health System, and Eastside Women's Specialists for the first time on appeal. However, Sorrell never amended her complaint to allege breach of warranty against those defendants, and Sorrell never amended her complaint to substitute named parties for the fictitiously named defendants described in her claim alleging breach of warranty. The record indicates that Medical Center East, Eastern Health System, and Eastside Women's Specialists were not put on notice that Sorrell was alleging breach-of-warranty claims against them. See Adkison, v.Thompson, 650 So.2d 859, 862 (Ala. 1994) ("the primary purpose of pleading is to give fair notice to adverse parties of a claim against them"). The trial court's summary judgment for Medical Center East, Eastern Health System, and Eastside Women's Specialists was not improper on the basis of Sorrell's breach-of-warrantyclaims, because Sorrell alleged the breach-of-warranty claims only against fictitiously named defendants that were never identified.
 IV.
In her reply brief, Sorrell argues that summary judgment was improper because the trial court exceeded its discretion in reducing the amount of her expert's fee and because the defendants' summary-judgment motions did not conform to Rule 56, Ala. R. Civ. P. However, because Sorrell raised these two arguments for the first time in her reply brief, this Court will not address them. See Byrd v. Lamar, 846 So.2d 334, 341
(Ala. 2002) (holding that it is a "settled rule that this Court does not address issues raised for the first time in a reply brief").
 Conclusion
The summary judgment in favor of Dr. King, Eastside Women's Specialists, Eastern Health System, and Medical Center East is affirmed.
AFFIRMED.
NABERS, C.J., and LYONS, WOODALL, and PARKER, JJ., concur.
[1]. Dr. King had staff privileges at the hospital operated by Medical Center East, which is a subsidiary of Eastern Health System.
[2]. Depo-Provera is a birth-control medication that Sorrell had "used Depo-Provera for the that is administered through injections. Dr. past three years.
[3] Dr. King was an employee of Eastside Women's Specialists and Eastside Ventures, Inc., when he treated Sorrell. Eastside Ventures, a subsidiary of Eastern Health System, is not a party to this action.
[4] Dr. Lemons was also an employee of East-side Ventures; Dr. King testified that he was "the head of the department.
[5] Sorrell never identified any of the fictitiously named defendants described in this claim.
[6] Sorrell never identified any of the fictitiously named defendants described in this claim.
[7] Sorrell never identified any of the fictitiously named defendants described in this claim.
[8] Sorrell never identified any of the fictitiously named defendants described in this claim, i.e., those involved in the design, manufacture, assembly, sale and/or distribution of the manipulator.
[9] Under Rule 26(b)(4), Ala. R. Civ. P., a party is entitled to obtain information regarding the identity of any expert an opposing party expects to use at trial, along with the facts and opinions upon which the expert is expected to testify.
[10] Under Rule 26(b)(4)(C), Ala. R. Civ. P., a party seeking discovery of the facts and opinions held by an opposing party's expert witness shall be required to pay the expert a reasonable fee for time spent responding to discovery.
[11] Dr. Giles was never deposed in this case. Sorrell states in her brief on appeal that because the trial court "reduced [her] expert's fees," she "had to seek another expert."
[12] The record does not provide Dr. Shrout's full name, and there is no evidence in the record showing Dr. Shrout's qualifications.
[13] Sorrell did not request that the trial court vacate the judgment as to Dr. Lemons, and Sorrell does not challenge on appeal the summary judgment in favor of Dr. Lemons.
[14] The trial court stayed the proceedings pursuant to Ala. Code 1975, § 27-42-18, which states:
 "All proceedings in which the insolvent insurer is a party or is obligated to defend a party in any court in this state shall be stayed for up to six months and such additional time thereafter as may be determined by the court. . . . 
[15] It appears that the trial court treated this motion as a summary-judgment motion.
[16] The record does not contain a transcript of this hearing.
[17] In her complaint, Sorrell alleged:
 "On or before July 7, 2000, one or more of the fictitious party defendants, were in the business of formulating, designing, manufacturing, assembling, distributing and/or selling the [manipulator] and/or its component parts in the State of Alabama, and said defendants were formulators, designers, manufacturers, assemblers, distributors and/or merchants with respect to such goods. The aforesaid defendants impliedly warranted that the [manipulator] or its component parts were fit for the ordinary purpose for which such goods are used, i.e., that said goods were merchantable. The [manipulator] was used for the ordinary purpose for which such goods are used. Said defendants breached the aforesaid implied warranty [of] merchantability in that said [manipulator] or its component parts were [not] merchantable, i.e., [were] not fit for the ordinary purpose for which such goods are used. As a proximate result of the aforesaid breach of warranty by each of the aforesaid defendants, Plaintiff was caused to suffer the injuries and damages.