Rel: February 6, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2024-0718
_____

**Rebecca Ann Keister and Gerald Keister**

**v.**

**Neurology Consultants of Huntsville, P.C., and Jitesh Kar, M.D.**

**Appeal from Madison Circuit Court**
**(CV-20-900948)**

PER CURIAM.

Rebecca Ann Keister and Gerald Keister appeal from the Madison Circuit Court's summary judgment entered against them and in favor of the Neurology Consultants of Huntsville, P.C. ("Neurology Consultants"),

and Jitesh Kar, M.D., concerning the Keisters' negligence claims in their medical-malpractice action. We affirm in part, reverse in part, and remand the case to the circuit court.

## I. Facts

On May 7, 2018, Rebecca Keister ("Mrs. Keister") underwent an anterior-cervical-disk fusion that was performed by Dr. Derrick Cho. During follow-up visits after that surgery, Mrs. Keister complained about having balance problems, an unsteady gait, and having no control over her right leg. Because those problems did not appear to be side effects from the surgery, Dr. Cho referred Mrs. Keister to Neurology Consultants for evaluation. On September 17, 2018, Mrs. Keister was seen by Dr. Kar, who is employed by Neurology Consultants. Mrs. Keister complained to Dr. Kar of feeling fatigued, being unsteady on her feet, experiencing dizziness, and having an occasional lack of control of her right leg. Following his physical and mental evaluation of Mrs. Keister, Dr. Kar's differential diagnosis for her symptoms included: "[P]ossible intracranial causes like MS [multiple sclerosis], or cerebellar legion, or traumatic brain injury needs to be ruled out. We will like to get the MRI of the brain to rule out any intracranial abnormality, especially in the

cerebellum or brainstem which is causing intermittent balance issue." (Emphasis added.) In his deposition, Dr. Kar testified that he ordered an MRI to rule out each differential-diagnosis possibility.

In accordance with Dr. Kar's orders, on September 24, 2018, Mrs. Keister underwent an MRI of her brain. In his report on the MRI results, radiologist Dr. Gregory Gum's "Findings" included the observation that "[t]here are white matter changes diffusely present, the majority in the centrum semiovale. Upper, there are several foci of altered signal in the periventricular white matter region; the possibility of chronic demyelinization due to multiple sclerosis cannot be excluded." (Emphasis added.) The summary "Impression" in the report stated: "Extensive white matter changes, some of which may reflect findings of chronic multiple sclerosis." (Emphasis added.)

In his deposition, Dr. Kar testified that he reviewed the radiologist's MRI report and that, in his judgment, the results ruled out the possibilities of a cerebellar lesion, a brain-stem lesion, and a traumatic brain injury. However, he also admitted that the MRI results did not rule out multiple sclerosis ("MS"). Dr. Kar testified that he "did not pass on those [MRI] results to Ms. Keister." Dr. Kar stated that he had instructed

Mrs. Keister to call Neurology Consultants "if she has any worsening of the symptom" but that his office would not call her unless there was a "dangerous or worrisome finding" on the MRI. Dr. Kar testified that, in his judgment, the "MRI did not have any worrisome finding or a dangerous finding for me to -- or anything necessary for me to call her and notify her." Dr. Kar listed "worrisome results" as "anything which is like acute stroke, tumor, bleeding in the brain, or any enhancing legion, or swelling, then we notify the patient." Dr. Kar stated that Mrs. Keister, or any patient, "definitely has a right to know the results" of testing, and that, "if she would have called, we would have definitely been happy to notify her," but that he had a duty to call Mrs. Keister only "if there was any worrisome finding." Dr. Kar also testified that he did not schedule a follow-up visit with Mrs. Keister within a specific time frame because he did not think it was necessary in her case.

Following her visit to Dr. Kar, Mrs. Keister continued to experience troublesome physical issues that she reported to her primary-care physician. Those issues included: memory difficulties, episodes of vertigo, frequent balancing problems, an abnormal sensory phenomenon of a cold-water sensation running down her thigh, a sensation of feeling bubbles

under her skin, fatigue, swallowing difficulties, hoarseness of her voice, and some sensory abnormalities in her mouth when she flossed her teeth. Consequently, in March 2020, her primary-care physician referred Mrs. Keister to Dr. Christopher LaGanke, a neurologist who specializes in seeing patients with MS. In his deposition, Dr. LaGanke testified that probably 80% of his patients have MS. Dr. LaGanke's initial examination on March 27, 2020, confirmed Mrs. Keister's balance problems, diminished vibration sensation, and nerve pain, and so he ordered an MRI of her brain.

On April 16, 2020, Mrs. Keister underwent a second MRI of her brain. Dr. LaGanke testified that the first MRI showed "between 50 to 60 scars on the brain" and that he "noted six additional lesions on the scan in 2020 that were not present on the scan in 2018." Dr. LaGanke admitted, however, that the 2020 MRI took thinner "slices" of images, meaning that the 2020 MRI "can show more detail" than the 2018 MRI. Dr. LaGanke stated that Mrs. Keister "[m]ost probably" had MS in 2018 "from a scan standpoint and then the change that occurs after and the neurological symptoms and the neurological findings." He also admitted that "[t]here is no one test that's diagnostic" of MS, meaning that "nobody

can look at [an] MRI and say this patient has MS." In other words, further testing must be performed to confirm the diagnosis. Dr. LaGanke performed several other tests on Mrs. Keister before concluding: "Given that [Mrs. Keister] had had neurological symptoms as she did which were progressive over time, and she had new lesions in her brain and she had no other cause for those legions, we diagnosed her with Multiple Sclerosis at that time." (Emphasis added.)

Dr. LaGanke placed Mrs. Keister on several medications for treatment of MS, including Tysabri infusions taken once a month. He saw her again in August 2020, and his impression was that some of her symptoms were improving and some were not. He put her on some new medications based on his examination and her feedback. When Dr. LaGanke saw Mrs. Keister again in January 2021, he concluded that her MS symptoms had "leveled out" and were "better … on the whole." He testified that another MRI performed on Mrs. Keister's brain in August 2021 showed that "the scars and white matter of the brain were stable." In other words, no new legions or scarring had developed in her brain. Mrs. Keister visited Dr. LaGanke again on February 8, 2022. In that

visit, Dr. LaGanke assessed that Mrs. Keister "was very stable with her MS, and her pain was stable, so she was really quite stable at that point."

On July 6, 2020, the Keisters commenced an action against Neurology Consultants and Dr. Kar, alleging that they had "negligently caused, or negligently allowed Plaintiff, Rebecca Ann Keister, to go without proper and necessary evaluation, analysis, testing, treatment and follow up for multiple sclerosis after the report of their ordered MRI on September 24, 2018." The Keisters asserted that the delay in the diagnosis and treatment for Mrs. Keister's MS caused her condition to be worse than it would have been if they had been informed of the September 2018 MRI results.

On July 30, 2020, Dr. Kar filed a motion to dismiss the complaint. On August 17, 2020, Neurology Consultants filed an answer to the complaint. On September 10, 2020, the Keisters filed a response in opposition to the motion to dismiss. On September 22, 2020, the circuit court denied Dr. Kar's motion to dismiss. The following day, Dr. Kar filed his answer to the complaint.

The action proceeded to discovery, and on July 24, 2023, the Keisters filed their expert disclosure, in which they named Dr. Daniel

Kantor, a board-certified neurologist who is involved with several MS medical-advisory boards, as their standard-of-care and causation expert witness. In pertinent part, the expert disclosure stated:

"Dr. Kantor is of the opinion that at the time that Rebecca Keister presented to Dr. Kar on September 17, 2018, she was exhibiting signs and symptoms of Multiple Sclerosis. At that visit, Mrs. Keister was complaining of feeling off balance or dizzy and episodes of 'walking like a drunken person.' Dr. Kar's clinic notes state 'Differential diagnosis at this time includes possible intracranial causes like MS, or cerebellar lesion or traumatic brain injury needs to be ruled out. We will like to get the MRI of the brain to rule out any intracranial abnormality, especially in the cerebellum or brainstem which is causing intermittent balance issue.' Dr. Kar ordered [an] MRI and that scan was performed on September 24, 2018. The MRI revealed 'several foci of altered signal in the periventricular white matter region with the possibility of chronic demyelization due to multiple sclerosis cannot be excluded.' The impression noted: 'Extensive white matter changes some of which may reflect findings of chronic multiple sclerosis.' Mrs. Keister should have been informed of this abnormal result, but she was not.

"Dr. Kar reported to Mrs. Keister that he would notify her if there were any abnormal findings and he failed to do so. Dr. Kar breached the applicable standards of care by not reporting to Mrs. Keister that her MRI scan results were abnormal. Dr. Kar further breached the applicable standards of care by not informing Mrs. Keister of her Multiple Sclerosis diagnosis and causing a significant delay -- of two years -- for treatment of MS. Studies have shown that earlier treatment of MS will lead to a longer life expectancy. This delay in

8

<u>therapy and treatment of her condition has affected her neurologic outcome</u>."

(Emphasis added.)

Dr. Kantor was deposed on October 26, 2023. Dr. Kantor was first asked whether he believed Mrs. Keister has MS.

"Q. [Dr. Kar's counsel:] We're going to get into this in a little bit more detail, but it -- is it your belief that Mrs. Keister does, in fact, have MS?

"A. [Dr. Kantor:] Yes.

"Q. And what is that based on?

"A. That's based on the totality of her records, including her initial encounter or her only encounter, excuse me, with Dr. Kar and her interactions with Dr. LaGanke.

"Q. Putting that all together, including Dr. LaGanke's actual diagnosis of MS, it's your feeling that Mrs. Keister presently has MS?

"A. Yes.

"Q. Is it your feeling that she had MS when Dr. Kar saw her on September 17, 2018?

"A. She had at least biological MS, if not the clinical symptoms and signs of it, but I believe she did have MS at that time. The only question to me is whether she would have qualified for an MS research trial, which has stricter criteria.

9

"Q. When you say you feel Mrs. Keister at least had biological MS on September 17, 2018, are you saying putting the totality of everything together, including her later treatment with Dr. LaGanke, you feel like she probably actually had MS at the time she was in Dr. Kar's office?

"A. Correct.

"....

"Q. But Dr. Kar couldn't have diagnosed it on that date with the information that he had?

"A. Correct. Normally we would see a patient again.

"Q. Even if she had biological MS on September 17, 2018, and you are correct about that, when she was walking out of Dr. Kar's office, he couldn't have known that at that time?

"A. He could have been suspicious, which it sounds like he was, but he wouldn't have known more definitely."

(Emphasis added.) Thus, Dr. Kantor testified that he believes that Mrs. Keister has MS and that she had "at least biological MS" at the time she was seen by Dr. Kar.[1]

---

[1]In their depositions, the experts for Neurology Consultants and Dr. Kar testified that the September 2018 MRI did not contain indications that Mrs. Keister had MS and that the medical evidence supported the conclusion that her medical conditions were caused by something other than MS.

10

Dr. Kantor was then asked about the content of his expert-disclosure statement.

"Q. [Dr. Kar's counsel:] The operative paragraph [in the expert disclosure], if you will, concerning your opinions states that your opinion is that Dr. Kar breached the applicable standards of care by not reporting to Mrs. Keister that her MRI scan results were abnormal, that's number one, right?

"A. [Dr. Kantor:] Correct.

"Q. Number two, that Dr. Kar further breached the applicable standard of care by not informing Mrs. Keister of her MS diagnosis, that's the second part?

"A. Correct.

"Q. And then the third part, as I understand it, is the causation part and to pick up that sentence, and causing a significant delay of two years for treatment of MS, and is that the third part of your opinion?

"A. Correct.

"Q. So as I understand it, there are two standard of care opinions, as outlined, that we just agreed upon, and then a causation opinion which is coupled with that?

"A. Yes.

"Q. Is that basically it?

"A. Yes.

"....

11

"Q. The last sentence which goes to causation says, 'This delay in treatment of her condition has affected her neurological outcome.'

"A. Correct.

"Q. What do you mean by that?

"A. The body of literature has shown that a delay in treatment or the later you start treatment, the worse your neurological outcomes are. I believe that in her case also, she would have done better had she been on -- had she been diagnosed and placed on medication earlier.

"Q. Can you point to any worsening of Mrs. Keister's condition from Dr. Kar's single encounter with her on September 17, 2018, up until when Dr. LaGanke actually diagnosed her with MS and started treating her for it?

"A. Yes.

"Q. What?

"A. Offhand, I can recall fatigue and fatigue is -- is a hallmark of multiple sclerosis. It sounded like her sensory problems were significantly worse.

"Q. Which sensory problems?

"A. Both her legs, as well as, I believe her -- her face.

"Q. What about her face and legs?

"A. In her face, she had this sensation -- she had the sensation in her gums where it was different on one side versus the other. And I believe she reports to Dr. -- I believe it's to Dr. LaGanke that there was a difference she could feel even when she was flossing.

"Q. What about her legs?

"A. In her legs, she had a sensation of -- I believe she used the term bubbling, B-U-B-B-L-I-N-G, and she also, I recall Dr. LaGanke documented she had a corset like feeling, C-O-R-S-E-T.

"Q. Anything else, other than fatigue and the sensory problems in her legs and face, that you would say are evidence of a worsening in her condition from the time Dr. Kar saw her until Dr. LaGanke diagnosed her with MS and started treating her?

"A. Yes. It sounds like overactive bladder or urinary symptoms were worse. It is unclear to me whether constipation was worse or not. It sounded to me like cognitive problems were worse.

"Q. Which ones?

"A. Cognitive problems in multiple sclerosis are different than the cognitive problems you expect in dementia. It's more a problem of parallel processing, of word finding difficulty, of what was that I was trying to remember, and it sounded like this is what was being described.

"She also had -- according to Dr. LaGanke, she had hoarseness in her voice and at one point I recall they were in

13

discussion, at least at one point, of her having potential swallowing difficulty as well.

"Q. Did she have swallowing difficulty before she ever saw Dr. Kar?

"A. Not that I recall.

"Q. Okay. But are you saying that it's your impression that her fatigue had gotten worse during that period of time?

"A. Yes.

"Q. Other than fatigue, the sensory problems in her legs and face; perhaps, overactive bladder became worse; and cognitive problems and if I heard you right on that, what you're saying is she started saying, I can't think of what I was thinking about a few minutes ago; and some hoarseness; have I got the list right so far?

"A. So far, yes.

"Q. Are there any other things you said are evidence of her worsening condition during that interval that we're talking about?

"A. It sounded to me from the records that her walking had gotten worse in between as well.

"Q. Okay. Anything else?

"A. Pain also became a prominent symptom.

"Q. What did, I'm sorry?

"A. Pain.

"Q. Pain where?

"A. I believe she had pain in her hips and legs, as well as -- as well as pain in other parts of her body, including her neck, which may not be related to the multiple sclerosis, the last one.

"Q. Given the very complicated neck surgery she had, we agree her neck pain is probably not related to any MS, as Dr. LaGanke agreed?

"A. Correct.

"Q. Okay. Have we covered the list of things that you believe you would point to and say it sounds like these things had gotten worse during that interval [between when Mrs. Keister saw Dr. Kar and when she saw Dr. LaGanke]?

"A. I believe so."

(Emphasis added.)

When he was asked about the differences between the detail of the April 2020 MRI versus the September 2018 MRI, Dr. Kantor agreed with Dr. LaGanke that the second MRI showed more detail. Dr. Kantor testified that he did not "think the number of lesions is indicative of whether -- of what the sort of abnormality is." He also admitted that it was possible that the six additional lesions that Dr. LaGanke counted as

15

new lesions in the April 2020 MRI could have been present at the time the September 2018 MRI was performed but could have been "unseen" because of "the thicker cut from the previous MRI." He also agreed that "MS is not a radiological diagnosis." However, Dr. Kantor was then asked whether Mrs. Keister's white-matter lesions had any significance.

> "Q. [Dr. Kar's counsel:] Would you agree that white matter lesions like those identified in Mrs. Keister's MRI of September 24, 2018, are non-specific?
>
> "A. [Dr. Kantor:] <u>Her white matter lesions looked a little bit more suspicious for multiple sclerosis</u>. Are they 100 percent diagnostic, no, as we've discussed, MRI is not.
>
> "Q. What I'm asking is, are they, in fact, non-specific to any diagnosis?
>
> "A. [Dr. Kantor:] I think we're using the term 'non-specific' differently. The term 'non-specific' in a radiology report or in discussion of white matter lesions means that they don't have the appearance of something that causes white matter lesions that has a general appearance. <u>In this case, [Mrs. Keister's] white matter lesions did look more like multiple sclerosis than just a normal wear and tear that can occur in the brain</u>.
>
> "Q. [Dr. Kar's counsel:] Why do you say that?
>
> "A. The location, their size, their distribution, their shape."

(Emphasis added.)

Dr. Kantor was then asked what his specific problem was with Dr. Kar's care and treatment of Mrs. Keister.

"Q. [Dr. Kar's counsel:] Now, if she did have biological MS at the time, as you've opined, we know Dr. Kar gets the MRI report of September 24, 2018, and he saw it sometime within a day or two of that, you with me so far?

"A. [Dr. Kantor:] That's my understanding.

"Q. What follow-up are you saying he should have done at that point?

"A. There are several things he should have done in follow-up. Because he told the patient that he would contact her if there was an abnormality, he should have contacted the patient.

"Q. And told her what?

"A. It's, perhaps, a conversation that's better done in person than over the telephone. Also, in his note, he raises multiple sclerosis as a possibility, but it's not clear to me how much he raised -- how much he discussed that possibility with the patient. Sometimes we'll bring it up in passing, but may not -- may not delve into it that first office visit.

"Q. Here is what I'm asking, after he got that MRI report and reviewed it, what are you saying [Dr. Kar] actually should have said to [Mrs. Keister], whether it's over the phone or in person, what are you saying he should have said to her at that time?

"A. He should have said to her that the MRI was abnormal. It did not look like she had a stroke. It did not look like she had a tumor. It did not look like she had some rare

17

space-occupying lesion. There were white spots in the brain that looked consistent with one of the diagnoses that he had raised earlier, which was multiple sclerosis. <u>And what this means is we need to do continued follow-up, as well as rule out other causes</u>.

"....

"A. My problem with Dr. Kar is he took away [Mrs. Keister's] ability to make decision-making, because he withheld important information from the patient."

(Emphasis added.)

The responses from Dr. Kantor seemed to focus on the standard of care, and so Dr. Kar's counsel then probed the issue of causation.

"Q. [Dr. Kar's counsel:] Now, if Dr. Kar had done the follow-up that you feel he should have done, as you've outlined to me --

"A. [Dr. Kantor:] Yes.

"Q. -- <u>you can't say that Mrs. Keister's outcome would be any different than it is, can you</u>?

"A. From my experience and the body of literature, I think that delaying diagnosis and, even more delaying treatment, can make a patient have a worse outcome. <u>Do I know specifically in her case, no</u>."

(Emphasis added.)

After eliciting the foregoing response, Dr. Kar's counsel sought to close the loop on his questioning of Dr. Kantor.

> "Q. [Dr. Kar's counsel:] Have we covered all of the opinions that you have with regard to Dr. Kar's treatment of Ms. Keister and whether she would have had a different outcome if Dr. Kar had done what you say he should have done, have we covered all of that?
>
> "A. [Dr. Kantor:] I believe so, yes."

The Keisters' counsel followed up with closing questions about the standard of care and the necessity for early diagnosis and treatment of MS.

> "Q. [The Keisters' counsel:] Do you have an opinion as to what the standard of care requires a physician to do with regard to informing patients of MRI results?
>
> "A. [Dr. Kantor:] Yes.
>
> "Q. And what is that opinion?
>
> "A. <u>That the duty of a physician is to tell and counsel a patient on results of any testing that's performed</u>. I learned very clearly in my training you don't order tests unless you know why you're ordering them and you don't order tests unless they're going to make some sort of difference, and <u>to order a test and to have an abnormality and to tell a patient you're going to call them if there's an abnormality, but you don't call them, to me, falls beneath the standard of care</u>.

19

"Q. And you mentioned earlier that you felt like at the time she presented that she did have MS. Explain why you felt that way -- why your opinion is that way.

"A. At the time when she presented, I think it was reasonable to list multiple sclerosis among other possibilities.

"I think afterwards, having the results of the MRI and if other testing had been done, such as laboratory testing that we talked about, if the patient had been seen again, then I believe that the diagnosis of MS could have been made and established at that time.

"Q. And you mentioned this a little bit earlier about early diagnosis and treatment is important in MS. Why is that?

"A. There's several reasons. One reason is that some people have described it as time is brain and the idea of that the longer you don't treat somebody with multiple sclerosis with a disease modifying agent, you are allowing the ongoing processes of multiple sclerosis to cause damage to the central nervous system, including the brain.

"There's also the human aspect of it, which is making somebody not live in limbo and getting a diagnosis, oftentimes, I've found has been the greatest relief people will have.

"But I've got to tell you, it's interesting. Probably the most common response we get when we make the diagnosis is, 'Well, thank God it's not a brain tumor.' That's one of the things patients are more scared of than, I would say, multiple sclerosis.

"So I think both in terms of your outcomes, which are -- which have been shown time and again that are affected by -- modifying agents. In fact, nowadays in the United States, placebo-controlled trials for more than six months certainly are, oftentimes, considered unethical, whereas several years ago, that wasn't the case. We were still doing that.

"Now we have so many treatments for multiple sclerosis and people's lives are better on those treatments and so withholding those treatments means that the ongoing damage of multiple sclerosis can happen and, you know, we've found that with every relapse or every, you know, large inflammation or activity in multiple sclerosis, 50 percent of the time people actually accumulate clear disability with that.

"So the ongoing process is happening beneath the surface, beneath the surface that you can oftentimes see clinically that a patient, beneath the symptoms, meet the signs, even beneath the MRI."

(Emphasis added.)

On May 21, 2024, Neurology Consultants and Dr. Kar ("the defendants") filed a joint summary-judgment motion in which they contended that the Keisters had "failed to present expert testimony establishing that the alleged breach of the standard of care by Dr. Kar proximately caused any harm to Mrs. Keister." In making that argument, the defendants relied exclusively on Dr. Kantor's statements that, "[f]rom my experience and the body of literature, I think that delaying diagnosis

and, even more delaying treatment, can make a patient have a worse outcome. Do I know specifically in [Mrs. Keister's] case, no." The defendants contended:

> "Dr. Kantor's testimony is clear and unequivocal. He cannot and does not testify that Mrs. Keister probably would have realized a different outcome if Dr. Kar had informed her of the 2018 MRI results. In other words, there is no expert testimony that supports [the Keisters'] allegation that failing to inform Mrs. Keister of the 2018 MRI results probably would have caused her condition to worsen. As such, the [Keisters] have failed to offer any evidence which demonstrates that Mrs. Keister's current condition would probably have been different if Dr. Kar had taken a different action in September 2018."

On July 31, 2024, the Keisters filed a response in opposition to the defendants' summary-judgment motion. The Keisters primarily focused on the fact that Dr. Kantor had provided detailed testimony concerning the worsening of Mrs. Keister's condition between the September 2018 MRI and the April 2020 MRI. Indeed, the Keisters quoted at length from the portion of Dr. Kantor's deposition testimony that addressed his statement about causation in the expert disclosure that we quoted above. The Keisters emphasized that "Dr. Kantor listed the following conditions that had worsened: fatigue, sensory problems with her legs and her face, urinary symptoms, cognitive problems such as word finding difficulty,

22

walking, and her pain." The Keisters also highlighted the deposition testimony from Dr. LaGanke in which he discussed the additional lesions in Mrs. Keister's brain that he counted in the April 2020 MRI that were not present in the September 2018 MRI.

On August 3, 2024, the Keisters filed a supplemental response to the defendants' summary-judgment motion. In their supplemental response, the Keisters repeated their argument from their response, but they also focused on the fact that Dr. Kar had testified that he had a duty to make relevant information available to patients so that they could make educated decisions about their care and treatment and that he agreed with the proposition that "early diagnosis is important in the treatment of MS." The Keisters' supplemental response also highlighted Dr. Kantor's expert-disclosure statement with respect to causation and his deposition testimony that discussed medical studies that, he said, demonstrated "earlier treatment being impactful in terms of outcomes" for MS patients. The Keisters also provided more discussion of cases from this Court that concerned the "better-position principle" in medical-malpractice cases. Finally, the Keisters noted that, in Giles v. Brookwood Health Systems, Inc., 5 So. 3d 533, 550 (Ala. 2008), this Court held that

23

expert testimony must be examined as a whole and not be viewed "abstractly, independently and separately from the balance of his testimony."

On August 5, 2024, the defendants filed a reply to the Keisters' responses. The defendants again emphasized Dr. Kantor's statement that, "[f]rom my experience and the body of literature, I think that delaying diagnosis and, even more delaying treatment, can make a patient have a worse outcome. Do I know specifically in [Mrs. Keister's] case, no." The defendants insisted that that portion of Dr. Kantor's deposition was "the only time [Dr. Kantor] was asked this causation question by either counsel. His answer was direct and unequivocal." They argued that the Keisters had "failed to produce any evidence" indicating that, "if Dr. Kar had informed Mrs. Keister of her September 24, 2018 MRI results, she probably would have had a better or different outcome in her specific case."

On August 7, 2024, the circuit court held a hearing on the defendants' summary-judgment motion. On August 9, 2024, the circuit court granted the defendants' motion.

24

On September 6, 2024, the Keisters filed a postjudgment motion seeking to alter, amend, or vacate the circuit court's August 9, 2024, summary judgment. In that motion, the Keisters stated that, "[d]uring oral arguments on August 7, 2024, [the circuit court] felt that this case was analogous to … DCH Healthcare Authority v. Duckworth, 883 So. 2d 1214 (Ala. 2003)." The Keisters argued that the expert testimony provided by Dr. Kantor did not simply consist of "general statements as to causation," as did the expert's testimony in Duckworth, insisting that "[t]here has been very specific testimony as to [Mrs. Keister's] worsening condition over the 19-month delay in her diagnosis." To support that assertion, the Keisters submitted an "Affidavit for Clarification" from Dr. Kantor along with their postjudgment motion. That affidavit contained several lengthy quotations from Dr. Kantor's deposition testimony, and then it concluded with two paragraphs in which Dr. Kantor sought to expand upon the statements from his deposition upon which the defendants had based their summary-judgment motion.

> "5) When I stated I did not know specifically in [Mrs. Keister's] case if delaying diagnosis or treatment can make a patient have a worse outcome, I meant that I did not have exact or definitive knowledge rather than just probable knowledge.

25

"6) In regards to Mrs. Keister, based upon my education, training and experience and the extensive body of medical literature and a review of the medical records it is my opinion that it is probable to a reasonable degree of medical certainty that the delay in diagnosis and treatment caused by Dr. Kar worsened Mrs. Keister's condition. In my opinion, to a reasonable degree of medical certainty, prompt diagnosis and treatment would have likely placed the patient in a better position than the outcome resulting from delayed care."

On September 24, 2024, the defendants filed a response to the Keisters' postjudgment motion as well as a motion to strike Dr. Kantor's supplemental affidavit. In their response, the defendants argued that the Keisters had not presented proper grounds for reconsidering the judgment because they had not presented newly discovered evidence or demonstrated that the circuit court had made manifest errors of law or fact. They insisted that instead the Keisters had raised arguments that could have been raised before the entry of the summary judgment but were not. Specifically, the defendants emphasized that the Keisters could have attempted to seek clarification of Dr. Kantor's testimony during his deposition. They also noted that the Keisters had not previously sought to distinguish <u>Duckworth</u> even though the defendants had prominently cited it in their summary-judgment motion. They further argued that the statements in Dr. Kantor's supplemental affidavit were "entirely

26

conclusory, and even when considered with his prior deposition testimony, are speculative at best, with no support for Dr. Kantor's bald, legalistic assertion in the Affidavit." In their motion to strike Dr. Kantor's supplemental affidavit, the defendants argued that the affidavit was impermissible because it was simply "new evidence, as opposed to newly discovered evidence," and that the circuit court lacked discretion to consider such evidence in support of a postjudgment motion. They also contended that Dr. Kantor's supplemental affidavit did not "clarify" his deposition testimony but, rather, "attempts to directly contradict [his] prior testimony on this very important issue."

On September 26, 2024, the circuit court held a hearing on the Keisters' postjudgment motion and the defendants' motion to strike Dr. Kantor's supplemental affidavit. The following day, September 27, 2024, the circuit court entered an order that granted the defendants' motion to strike Dr. Kantor's supplemental affidavit and that denied the Keisters' postjudgment motion.

The Keisters filed a timely appeal.

## II. Standard of Review

"We review a summary judgment de novo. Potter v. First Real Estate Co., 844 So. 2d 540, 545 (Ala. 2002) (citing

27

American Liberty Ins. Co. v. AmSouth Bank, 825 So. 2d 786 (Ala. 2002)).

> "'"We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. 'Substantial evidence' is 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw."'

"[Potter,] 844 So. 2d at 545 (quoting Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So. 2d 369, 372 (Ala. 2000)) (citations omitted).

> "Summary judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P."

Hooper v. Columbus Reg'l Healthcare Sys., Inc., 956 So. 2d 1135, 1139

(Ala. 2006).

### III. Analysis

The Keisters argue that the circuit court erred in entering a summary judgment for the defendants because, they say, the circuit court "focus[ed] only on one question and answer from [the Keisters'] expert neurologist" rather than considering "[t]he balance and whole of [Dr. Kantor's] deposition testimony." Keisters' brief, p. 36. They insist that "[t]he record on appeal ... present[s] substantial evidence that [Mrs. Keister] was denied a better position for a better outcome except for the violation of the standard of care." Id., p. 37. They also contend that Dr. Kantor's supplemental affidavit is appropriate and that such affidavits "have been encouraged for use in malpractice cases." Id., p. 38. They contend that the reason they submitted the affidavit was that they were "surprised [by the] failure of the [circuit] court to follow controlling law on the 'balance of the whole testimony.'" Id., p. 57.

We begin with the issue of Dr. Kantor's supplemental affidavit. The Keisters are correct that a party may be permitted to submit a subsequent affidavit that "merely [seeks] to clarify [a deponent's] answers to ambiguous questions asked by counsel during a deposition or other prior sworn proceeding or to supply information not necessarily

sought by questions asked at the deposition or other prior sworn proceeding." Wilson v. Teng, 786 So. 2d 485, 497 (Ala. 2000). But the defendants are also correct that, in such an affidavit, "'a party is not allowed to directly contradict prior sworn testimony to avoid the entry of a summary judgment.'" Id. (quoting Continental Eagle Corp. v. Mokrzycki, 611 So. 2d 313, 317 (Ala. 1992)).

Putting aside the question of whether Dr. Kantor's statements in his supplemental affidavit clarified or contradicted his previous deposition testimony, the problem for the Keisters is the point raised by the circuit court in the postjudgment hearing:

> "THE COURT: And let me stop you right there. So in the motion for summary judgment, I think it was clear that the -- what specific part of [Dr. Kantor's] transcript the defense was relying on, so why wasn't a clarification affidavit submitted prior to the summary judgment hearing to clarify the very specific issue that was regarding the summary judgment motion?"

The Keisters' counsel answered that question by stating that they had thought "the balance of [Dr. Kantor's] testimony made us safe," so they never thought a clarification was needed in response to the summary-judgment motion.

That is not an adequate reason for the Keisters' delay in filing a supplemental affidavit. If Dr. Kantor's testimony as a whole was sufficient to address the causation issue, then no supplemental affidavit was necessary, and if, as the Keisters contend, Dr. Kantor's affidavit simply clarified what he meant at the time of the deposition, it was not newly discovered evidence. "[A] Rule 59(e)[, Ala. R. Civ. P.,] motion does not operate to extend the time for filing affidavits or other material in opposition to a motion for summary judgment if by 'due diligence' the new evidence could have been discovered before the motion for summary judgment was submitted." Hannah v. Gregg, Bland & Berry, Inc., 840 So. 2d 839, 852 (Ala. 2002). In short, Dr. Kantor's supplemental affidavit was not timely filed. Therefore, the circuit court did not err in striking the affidavit.

The question that remains is whether Dr. Kantor's deposition testimony failed to establish a causal link between Dr. Kar's failure to inform Mrs. Keister of the September 2018 MRI results and Mrs. Keister's condition in April 2020 when she was finally diagnosed with MS and began treatment for that condition. The defendants contend the Keisters failed to present substantial evidence of causation based on Dr.

31

Kantor's statements that, "[f]rom my experience and the body of literature, I think that delaying diagnosis and, even more delaying treatment, can make a patient have a worse outcome. Do I know specifically in [Mrs. Keister's] case, no." The defendants argue that those statements show that Dr. Kantor did not know, and he could not say, that "the worsening of [Mrs. Keister's] symptoms" over the course of the 19 months between when Dr. Kar saw her and when Dr. LaGanke saw her "would have been prevented and the outcome probably would have been different" if Dr. Kar had informed Mrs. Keister of the September 2018 MRI results. Defendants' brief, p. 39. Indeed, the defendants go so far as to assert that there is no evidence

> "[of] how Ms. Keister would have responded in 2018 if she had been provided the MRI results by Dr. Kar; [of] what additional doctor(s), if any, she would have sought out or been referred to in response to that information or what any such doctor would have done differently, if anything; … that radiologically Ms. Keister <u>probably</u> had a relapse or worsening in her brain during those 19 months when all of her MRIs have remained stable without showing any acute injury for years according to her own expert; … that earlier treatment <u>probably</u> would have been started and <u>probably</u> would have lessened her physical symptoms given the evidence that many of those symptoms continued to worsen after treatment was begun according to her own medical records."

<u>Id.</u>, pp. 40-41 (emphasis in original).

32

However, the defendants' series of contingencies provides incorrect lenses for viewing the issue before us. In reviewing the summary judgment, we are supposed to view the evidence in the light most favorable to the Keisters and draw all reasonable inferences in their favor. See, e.g., Breland ex rel. Breland v. Rich, 69 So. 3d 803, 821 (Ala. 2011) ("When the evidence is reviewed in a light most favorable to [the plaintiff], as the nonmovant, and all reasonable inferences from the evidence drawn in her favor, as we are required to do when reviewing a summary judgment, the evidence presented indicates that premature infants are at risk for [retinopathy of prematurity], which affects the blood vessels on the retina in a premature infant's eyes."). Thus, we must assume that Mrs. Keister has MS -- and that she had it in 2018 when she was seen by Dr. Kar.

Moreover, the better-position principle holds that a plaintiff must present substantial evidence that, if the plaintiff had received medical treatment that meets the standard of care, such treatment would have placed the plaintiff in a better position than she was in after receiving inferior medical care. See Spencer v. Remillard, 325 So. 3d 747, 771 (Ala. 2020) ("[T]he premise of the 'better-position' principle [is] that ' "the issue

33

of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than [he] was in as a result of inferior medical care."' Hamilton v. Scott, 278 So. 3d 1180, 1186 (Ala. 2018) (quoting Parker v. Collins, 605 So. 2d 824, 827 (Ala. 1992))." (emphasis omitted)); Hrynkiw v. Trammell, 96 So. 3d 794, 806 (Ala. 2012) ("[W]hen there is an issue of dilatory diagnosis and treatment, there must be sufficient evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of the inferior medical care.").

In their summary-judgment motion, the defendants did not challenge that the Keisters had presented substantial evidence as to their allegations that Dr. Kar had breached the standard of care. The Keisters asserted -- and Dr. Kantor testified -- that Dr. Kar had breached the standard of care by not informing Mrs. Keister of the September 2018 MRI results and by not performing follow-up care that would have confirmed that Mrs. Keister had MS. Thus, here we are concerned with what probably would have happened if Dr. Kar had told Mrs. Keister about the MRI results and if Dr. Kar had performed follow-up care that

34

confirmed Mrs. Keister had MS. We are not concerned with whether Mrs. Keister would have sought medical treatment for her MS from other doctors or with whether such other doctors Mrs. Keister might have seen would have diagnosed her with MS and treated her for that condition. See, e.g., Waddail v. Roberts, 827 So. 2d 796, 800 (Ala. Civ. App. 2001) (observing that "[t]he issue is whether, for the purposes of a summary-judgment motion, the plaintiff presented substantial evidence indicating that Dr. Roberts acted, or failed to act, in such a way as to lessen Adam's chances of surviving this bout of diabetic ketoacidosis").

Therefore, the defendants' actual contention is that there is no evidence indicating that, if Dr. Kar had informed Mrs. Keister of her MRI results and if he had performed follow-up care that would have confirmed her MS diagnosis, Mrs. Keister's health would have been in a better condition than it was when she was diagnosed and treated for MS in April 2020. Again, that contention is based on a single portion of Dr. Kantor's deposition, in which he stated: "From my experience and the body of literature, I think that delaying diagnosis and, even more delaying treatment, can make a patient have a worse outcome. Do I know specifically in [Mrs. Keister's] case, no."

35

The problem for the defendants is that

"this Court [has] discussed at length the necessity of viewing a witness's testimony as a whole and that the jury must be permitted to determine the weight and credibility of witness testimony.

"....

"'"Our cases make it abundantly clear, however, that a portion of the testimony of the plaintiff's expert cannot be viewed 'abstractly, independently, and separately from the balance of his testimony.' Hines v. Armbrester, 477 So. 2d 302, 304 (Ala. 1985). See, e.g., Downey v. Mobile Infirmary Med. Ctr., 662 So. 2d 1152, 1154 (Ala. 1995) (noting that '[t]his Court has consistently held that the testimony of an expert witness in a medical malpractice case must be viewed as a whole, and that a portion of it should not be viewed abstractly, independently, or separately from the balance of the expert's testimony').

"'"....

"'"'"We are to view the [expert] testimony as a whole, and, so viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to prove."' Giles v. Brookwood Health Servs., Inc., 5 So. 3d 533, 550 (Ala.

36

2008) (quoting <u>Hines</u>, 477 So. 2d at 304-05)."'"

<u>Spencer</u>, 325 So. 3d at 770 (quoting <u>Hrynkiw</u>, 96 So. 3d at 800-01, quoting in turn <u>Graves v. Brookwood Health Servs., Inc.</u>, 43 So. 3d 1218, 1228 (Ala. 2009)).

As we detailed in Part I of this opinion, Dr. Kantor's testimony consisted of far more than the bare statement that he did not know if Mrs. Keister's outcome would have been worse. In particular, when directly asked about how "[t]his delay in treatment of [Mrs. Keister's] condition has affected her neurological outcome," Dr. Kantor responded: "[T]he later you start treatment, the worse your neurological symptoms are. I believe that in [Mrs. Keister's] case also, she would have done better had she been on -- had she been diagnosed and placed on medication earlier." In the defendants' only acknowledgment of that testimony, they describe this statement as nothing "beyond generalities" and assert that "the balance of Dr. Kantor's testimony" demonstrated that Dr. Kantor did not know "specifically" if Mrs. Keister would have done better. Defendants' brief, p. 25. But by "the balance of Dr. Kantor's testimony," the defendants merely refer to the single statement: "Do I know specifically in [Mrs. Keister's] case, no."

Immediately after Dr. Kantor stated that he believed that Mrs. Keister would have done better if she had been diagnosed earlier and placed on medication earlier, he was asked a series of questions by Dr. Kar's counsel concerning whether he could "point to any worsening of Mrs. Keister's condition from Dr. Kar's single encounter with her on September 17, 2018, up until when Dr. LaGanke actually diagnosed her with MS and started treating her for it?" Dr. Kantor responded, based on his examination of Mrs. Keister's medical records, with very specific testimony about numerous symptoms that had worsened for Mrs. Keister. He cited fatigue, sensory problems with Mrs. Keister's legs and face, an overactive bladder, her worsening "cognitive problems," hoarseness in her voice, swallowing difficulties, issues with "her walking," and pain in her hips and legs. The clear inference from Dr. Kantor's testimony that he believed Mrs. Keister would have done better if she had been diagnosed and placed on medication earlier and his testimony about the specific symptoms that got worse in the 19 months between when she was seen by Dr. Kar and when she was diagnosed and treated by Dr. LaGanke is that Dr. Kantor believed that those symptoms

-- Mrs. Keister's specific health condition -- would have been better if Dr. Kar had not breached the standard of care.

In addition to that testimony, Dr. Kantor also testified at length about why earlier diagnosis and treatment of MS makes a difference in a patient's life. He observed, for instance, that "the longer you don't treat somebody with multiple sclerosis with a disease modifying agent, you are allowing the ongoing process of multiple sclerosis to cause damage to the central nervous system, including the brain." He testified that "we've found that with every relapse or every, you know, large inflammation or activity in multiple sclerosis, 50 percent of the time people actually accumulate a clear disability with that." Dr. Kantor stated that studies are so conclusive that earlier treatment of MS produces better results that "nowadays in the United States, placebo-controlled trials for more than six months certainly are, oftentimes, considered unethical." Dr. Kantor also discussed a specific study that had "shown that earlier treatment of MS will lead to a longer life expectancy." He stated more generally that "[t]here's a large body of evidence -- a body of literature,

excuse me, that has to do with earlier treatment being impactful in terms of outcomes."[2]

The defendants discount the entirety of Dr. Kantor's testimony concerning earlier treatment resulting in better outcomes for MS patients as "insufficient conjectural expert testimony." Defendants' brief, p. 43. In support of that argument, the defendants cite McAfee v. Baptist Medical Center, 641 So. 2d 265 (Ala. 1994), which involved consolidated cases. With respect to one of those cases, this Court observed that "[t]he affidavit of the plaintiffs' expert, Dr. O. Carter Snead III, offered a conjectural observation that, generally, the sooner the onset of treatment, the better the expected result." Id. at 268. In the other case, the Court similarly noted that "the plaintiffs submitted affidavits stating, generally, that 'time is of the essence' in treating breast cancer, and that patients who receive earlier treatment obtain a better result." Id. The Court concluded that the affidavits "did not rise to the level of substantial evidence." Id.

---

[2]Dr. LaGanke similarly testified that "[t]here have been quite a number of studies performed in MS that show that the earlier a person is treated after diagnosis generally population statistically, people do better."

The defendants also attempt to draw a parallel to <u>DCH Healthcare Authority v. Duckworth</u>, 883 So. 2d 1214 (Ala. 2003), a case in which Dee Duckworth, an 83-year-old man who had gone to DCH Regional Medical Center to pick up his wife who was a patient there, died of a subdural hematoma after he had fallen from a hospital escalator and hit his head. The defendants highlight the <u>Duckworth</u> Court's conclusion, in which the Court likened the plaintiff's expert testimony to the testimony in <u>McAfee</u>:

> "The general statements proffered by McAfee and Roberts -- that 'time [was] of the essence,' and that 'the sooner the onset of treatment, the better the expected result' -- essentially mirror the statements made by Dr. Jones -- as soon as possible is 'always the ideal,' and 'any delay in diagnosis can adversely affect a person's condition.' Like the testimony in <u>McAfee</u>, Dr. Jones's opinion does not constitute substantial evidence that the two- or three-hour delay of which Mrs. Duckworth complains probably adversely affected Mr. Duckworth's response to treatment."

<u>Duckworth</u>, 883 So. 2d at 1221.

However, the parallels to <u>McAfee</u> and <u>Duckworth</u> do not hold up to closer scrutiny. In <u>McAfee</u>, this Court's analysis was truncated, but the Court stated with respect to the first case that "[t]here is no evidence that the actions of Dr. [Rodney] Dorand or those of Dr. Gillis Payne, who first saw the baby, probably caused the poor outcome." 641 So. 2d at 268 (emphasis added). In contrast, in this case, Dr. Kantor testified in detail

41

about the worsening of Mrs. Keister's symptoms and stated that she would have done better if she had been placed on medication at the time she saw Dr. Kar. As to the second case in McAfee, the Court stated that "[t]here was no expert testimony to rebut the testimony submitted by the defendants indicating that the metastasis to the lymph nodes probably occurred in the early stages before the cancer could be diagnosed." Id. In contrast, Dr. Kantor specifically stated that Mrs. Keister's "white matter lesions [in the September 2018 MRI] did look more like multiple sclerosis than just a normal wear and tear that can occur in the brain" because of "[th]e location, their size, their distribution, [and] their shape." It was for this reason, and the radiologist's observations in the MRI report, that Dr. Kantor concluded that Dr. Kar should have performed follow-up care with Mrs. Keister, which he believed would have led to an MS diagnosis.

The differences between this case and Duckworth are even more apparent because of the extensive testimony from the plaintiff's expert that was quoted in Duckworth. Mrs. Duckworth had contended that a two-hour delay in treating her husband's injuries had caused his death. But, as the Court observed:

"[C]onspicuously absent from this testimony is any opinion as to how -- or whether -- the two- or three-hour

42

diagnostic, or preoperative, period of which Mrs. Duckworth complains <u>probably affected the outcome of this case</u>. On the contrary, Dr. Jones testified that there was an <u>optimum period of eight hours</u> between diagnosis and surgery. The hematoma was discovered at 2:00 p.m. and removed by 6:00 p.m. Even computing the time from 10:24 a.m., when Duckworth <u>arrived at the emergency room</u>, until the hematoma was evacuated, only 7 1/2 hours occurred before the surgery -- within the optimum treatment period Dr. Jones described. Although Dr. Jones conceded that the hematoma 'could possibly [have been] smaller two hours earlier,' he did not explain how an increase in size would have adversely affected Mr. Duckworth's ultimate condition. He agreed with the general proposition that a 'delay in diagnosis [<u>could</u>] adversely affect a person's condition,' <u>not</u> that it <u>did</u> so in <u>this</u> case."

<u>Duckworth</u>, 883 So. 2d at 1220 (first emphasis added; footnote omitted).

In other words, the plaintiff's expert specifically testified that there would be no difference between waiting two hours and waiting eight hours to treat Mr. Duckworth's head injury.

No such testimony was elicited from Dr. Kantor in this case; in other words, Dr. Kantor never stated that the delay in Mrs. Keister's diagnosis and treatment would have made no difference in her condition. In fact, the tenor of his testimony as a whole was the exact opposite. It is true, as the defendants repeatedly emphasize, that Dr. Kantor stated that he did not "know specifically in [Mrs. Keister's] case" that the delay made her "have a worse outcome." But as the Keisters observe, that

43

statement could be interpreted to mean that Dr. Kantor could not know for certain that Mrs. Keister would have been better if she had been diagnosed and treated at the time she was seen by Dr. Kar. After all, Dr. Kantor also stated that he "believe[d] that in her case also, she would have done better had she been on -- had she been diagnosed and placed on medication earlier." As the Keisters note:

> "The standard for proving causation in a medical-malpractice action is not proof that the complained-of act or omission <u>was the certain cause of the plaintiff's injury</u>. Instead, as this Court has frequently reiterated, <u>the standard is one of the 'probable' cause</u>: '"'"There must be more than the mere possibility that the negligence complained of caused the injury; rather, there must be evidence that the negligence complained of probably caused the injury."'"' <u>Lyons v. Vaughan Reg'l Med. Ctr., LLC</u>, 23 So. 3d 23, 27-28 (Ala. 2009) (quoting <u>Sorrell v. King</u>, 946 So. 2d 854, 862 (Ala. 2006), quoting in turn <u>DCH Healthcare Auth. v. Duckworth</u>, 883 So. 2d 1214, 1217 (Ala. 2003), quoting in turn <u>Parker v. Collins</u>, 605 So. 2d 824, 826 (Ala. 1992) (emphasis omitted))."

<u>Hill v. Fairfield Nursing & Rehab. Ctr., LLC</u>, 134 So. 3d 396, 406 (Ala. 2013) (emphasis added). If Dr. Kantor was, in fact, merely stating that he could not be certain that Mrs. Keister's condition would have been better if she had been diagnosed and treated earlier, then that statement does not demonstrate a lack of substantial evidence as to causation.

In short, at the very least, the statement in Dr. Kantor's testimony upon which the defendants have relied for a summary judgment <u>could</u> be understood as ruling out that Mrs. Keister would have had a better outcome if she had been diagnosed with MS and treated at the time she saw Dr. Kar, but it also <u>could</u> be understood as merely stating that Dr. Kantor did not know for certain that Mrs. Keister would have had a better outcome. We were presented with a very similar situation in <u>Spencer</u>:

> "The evaluation required with respect to Dr. Steckel's causation testimony is similar to what is required in examining the defendants' objection that Dr. Haines's standard-of-care testimony sought to impose a heightened standard of care. That is, Dr. Steckel's testimony could be understood as positing a 'probability of a possibility' that Scott's cancer had not metastasized in 2009, as the defendants put it. The defendants' brief, p. I. However, Dr. Steckel's testimony also <u>could</u> be understood as stating that, in all probability, Scott's cancer had not metastasized in 2009, and probability, not certainty, is what is required to present substantial evidence of causation under the [Alabama Medical Liability Act]. As we concluded with respect to the testimony of Dr. Haines, <u>when Dr. Steckel's testimony is viewed in its totality and in a light most favorable to Kimberlee, his testimony should not have been excluded for a failure to provide substantial evidence of causation. It should have been left to a jury to decide if Dr. Steckel established that the defendants' alleged breach of the standard of care probably caused Scott not to be in a better position than he otherwise would have been if he had been informed of the PSA lab-test result in 2009</u>."

325 So. 3d at 771 (second emphasis added).

We believe that the reasoning applied in <u>Spencer</u> is also applicable in this case. Dr. Kantor's testimony, when viewed in its totality and in the light most favorable to the Keisters, shows that he believed that Mrs. Keister's condition worsened as a result of Dr. Kar's allegedly substandard care. At the least, there is a conflict in Dr. Kantor's testimony concerning causation, and it should be left to a jury to decide whether Dr. Kar's alleged breach of the standard of care caused Mrs. Keister to be in a worse physical condition than she otherwise would have been if she had been informed by Dr. Kar about the results of the September 2018 MRI and had received follow-up care.

## IV. Conclusion

We agree with the circuit court that Dr. Kantor's supplemental affidavit was due to be stricken because it was not timely filed. However, we also conclude that the balance of Dr. Kantor's testimony presents an issue of fact as to whether Dr. Kar's failure to inform Mrs. Keister about the September 2018 MRI results and his failure to perform follow-up care caused Mrs. Keister's MS condition to be worse than it would have been if she had received care from Dr. Kar that met the required standard.

Therefore, the summary judgment in favor of the defendants is reversed, and the case is remanded for further proceedings.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Stewart, C.J., and Shaw, Bryan, Mendheim, and McCool, JJ., concur.